**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-02387-RPM

WELI A. FARAH,

      Plaintiff,

v.

JBS USA, LLC d/b/a SWIFT COMPANY,

      Defendant.

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Defendant JBS USA, LLC ("Defendant" or "JBS"), submits the following Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(a):

**<u>INTRODUCTION</u>**

Plaintiff Weli Farah's ("Plaintiff" or "Farah") Complaint asserts two claims for relief: (1) race and national origin discrimination under 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and (2) race discrimination under 42 U.S.C. § 1981 ("Section 1981"). Doc. 1, Comp., ¶¶ 27-40. Based on the undisputed facts and applicable law, neither claim can survive. Farah cannot maintain a claim of discrimination because his discharge had nothing to do with his race or national origin. Farah was terminated for serious misconduct and violation of company policies. Maxamed Xasan, the individual Farah claims harbored discriminatory animus toward him, was not involved in the decision to terminate Farah's employment. Nor can Farah present evidence sufficient to cast doubt on JBS' legitimate and non-discriminatory reasons for his termination. In addition, Farah's claim of national origin discrimination fails as a matter of law because it is

founded on a theory of regional discrimination.  Farah's Complaint should be dismissed in its entirety.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

**A.    General Background.**

1.       Weli Farah was born in Burco, a suburb of the city Hargeisa.  ***Exhibit A***, Weli Farah Deposition Transcript ("Farah Depo. Tr.") 6:15-20; 7:22-25; 8:1-6.  Hargeisa and Burco are in the Northwest region of Somalia and fall within the internationally unrecognized Republic of Somaliland.  *Id.* at 7:1-12.

2.       On March 3, 2009, Farah was hired by JBS and began working in a production position at its Greeley, Colorado beef processing plant.  Ex. A, Farah Depo. Tr. 29:11-24.

3.       On April 14, 2009, Farah became a Classroom Trainer.  ***Exhibit B***, Job Change Form.  Classroom Trainers are responsible for orientation and training of newly hired employees and conducting annual retraining for existing employees.  ***Exhibit C***, Yulibeth Rocha Deposition Transcript ("Rocha Depo. Tr.") 40:12-16.

4.       As a Classroom Trainer, Farah primarily worked the second, or "B" shift, which ran from approximately 2:30 to 11:00 p.m.  Ex. C, Rocha Depo. Tr. 55:1-24.  At some point, however, Farah began working split shift, from approximately 10:00 a.m. to 6:30 p.m., overlapping a portion of both A and B shifts.  Ex. C, Rocha Depo. Tr. 56:12-22; 57:3-11.

5.       Maxamed Xasan became the Human Resources Director at JBS' Greeley plant on October 20, 2014.  ***Exhibit E***, Declaration of Maxamed Xasan, ¶ 2.  Xasan was never Farah's

---

[1] Some of the facts below are characterized by Defendant as undisputed solely for purposes of this Motion.

Active/44055969.1

supervisor.  *Id.* at ¶ 6; *see also* Ex. A, Farah Depo. Tr. 47:8-25; 48:1-8; 49:11-25; 50:1-15; 51:20-25; 52:1 (recounting all of Plaintiff's supervisors).  Like Farah, Xasan is a black African-American who was born in Somalia.  Ex. E, ¶ 3; Ex. A, Farah Depo. Tr. 54:2-12.

6.      Yulibeth Rocha began her employment with JBS at the Cactus, Texas plant.  Ex. C, Rocha Depo. Tr. 10:9-11.  In January 2015, Rocha accepted a promotion to the position of Training Manager in the Greeley, Colorado plant.  Ex. C, Rocha Depo. Tr. 21:5-17.

7.      As the Greeley Training Manager, Rocha supervised four Classroom Trainers, including Farah, and twenty-two Production (or Floor) Trainers, on both A and B shifts.  Ex. C, Rocha Depo. Tr. 30:13-25; 31:15-24; 38:5-16; 39:4-24; 40:1-3.

8.      Rocha did not know where Farah was born, his country of origin, or his ancestry.  Ex. C, Rocha Depo. Tr. 90:24-25; 91:1-17.  Rocha never talked with employees about their ancestry or national origin.  *Id.* at 91:12-14; 92:7-11.

9.      Kacem Andalib was the B shift Human Resources Supervisor at the JBS plant.  ***Exhibit D***, Kacem Andalib Deposition Transcript ("Andalib Depo. Tr.") 8:13-15.

10.      Andalib knew Farah was from Somalia, but did not know whether he was from Northern Somalia or Southern Somalia.  Ex. D, Andalib Depo. Tr. 41:6-16.  Andalib had never heard of Somaliland prior to his deposition and did not know if there was a difference between Somalia and Somaliland.  *Id.* at 41:20-25; 42:10-13.  Andalib knew Maxamed Xasan was from Somalia, but did not know whether he was from Northern Somalia or Southern Somalia.  *Id.* 42:21-25; 43:1-2.

Active/44055969.1

**B.      Language Interpretation During Orientation And Training.**

11.     During orientation, new employees are permitted to bring their own interpreter if they feel they need help to understand the classes.  Ex. C, Rocha Depo. Tr. 77:19-23.  If necessary, JBS may ask other new hire employees taking part in the orientation to help interpret. *Id*. at 78:10-20.

12.     Many of the Production Trainers speak multiple languages and will help interpret for employees on the production line once they finish their training.  Ex. C, Rocha Depo. Tr. 81:21-25; 82:1-11.

13.     Classroom Trainers such as Farah did not have authority to remove a production employee from the line to assist them with interpretation.  Ex. C, Rocha Depo. Tr. 283:1-15.  If a Classroom Trainer needed interpretation assistance, he was expected to speak to Rocha who would communicate with the Production Superintendent to make sure an employee could be removed from the line to help.  *Id.*

14.     Prior to the March 2015 investigation into Farah's conduct, Rocha was not aware that Farah was calling production employees off the line to help interpret orientation and training sessions.  Ex. C, Rocha Depo. Tr. 117:13-25; 118:1-4.

15.     During her tenure as Training Manager, Rocha was not aware of any Classroom Trainer other than Farah who removed employees from the production line to interpret for training.  Ex. C, Rocha Depo. Tr. 282:18-25.  After Farah's discharge, Rocha confirmed with the other Classroom Trainers that they did not engage in this practice.  *Id*. at 284:19-25; 285:1-10.

Active/44055969.1

**C.    Farah's Conduct Comes Under Scrutiny.**

16.    On Friday, March 6, 2015, Marietta Herrera Lopez, a B shift Production Trainer who worked on the Rib Line, missed a 4:00 p.m. mandatory weekly trainer meeting.  Ex. C, Rocha Depo. Tr. 169:9-24; 170:1-3; 171:10-15.   The following Monday, Lopez's supervisor approached Rocha on the production floor and complained that Lopez was never at her work station on the line.[2]  *Id*. at 169:8-24; 173:17-25; 174:1-25.

17.    Concerned, Rocha talked to Lopez to find out why she missed the meeting and why she was not consistently at her work station.  Ex. C, Rocha Depo. Tr. 175:15-25; 176:1-2. Lopez told Rocha that she was away from her work station because Farah had "her doing other things." *Id.*  Lopez reported that she missed the Friday meeting because Farah had instructed her to fill in for a female employee in the Packaging Department while that employee went to the training classroom so that she and Farah could talk.  *Id*. at 177:5-15.  Lopez said that Farah kept that female employee away from her position on the line most of the day, forcing Lopez to fill in for her during that entire period.  *Id*.  Lopez also reported that Farah regularly summoned the same female employee to the Training Department, and he would keep her there for periods ranging from half an hour to an hour, or even all day.  *Id*. at 178:1-7.

18.    Lopez also told Rocha that she had not complained about Farah's conduct because she was afraid Farah would retaliate against her.  Ex. C, Rocha Depo. Tr. 178:22-25; 179:1-8. Lopez was so concerned about retaliation by Farah that she asked Rocha not to tell him about their conversation.  *Id*. at 180:14-21.

---

[2] As a Production Trainer, Lopez was required to arrive at her designated line before 3:15 p.m. and she was expected to remain on the line during her eight hour shift.  Ex. C, Rocha Depo. Tr. 176:3-8.  Production Trainers are primarily responsible for on-the-job training of employees while they work on the line.  *Id*. at 283:16-20.

Active/44055969.1

19.     The same day Rocha spoke to Lopez, one of the Classroom Trainers told Rocha that Farah had a girl in the training room.  Ex. C, Rocha Depo. Tr. 185:7-23; 186:8-13; 188:10-25; 189:1-25; 190:13-22; 191:2-12; 193:7-10.  As Rocha walked toward the training room, she passed female production employee Efrah Abdellah going the opposite direction.  *Id.*  When Rocha arrived at the training room, the door was open, and she observed Farah and female employee Anab Ali standing close to each other talking.  *Id.*

20.     Later that day, Rocha asked Classroom Trainer Chandra Acharya about Farah's interactions with female employees.  Ex. C, Rocha Depo. Tr. 196:16-25.  Acharya reported that Farah regularly took female employees into the back room, which required Acharya to handle all of the training and orientation.  *Id.* at 197:1-12.  Acharya also told Rocha that Farah kept keys to Rocha's office, and that he had seen Farah take female employees into Rocha's office after she left work for the day.  *Id.* at 197:16-25; 198:1-2.  After learning Farah had keys to Rocha's office, JBS changed the locks.  *Id.* at 198:8-24.

21.     On Tuesday, March 10, 2015, Rocha approached Human Resources Supervisor Andalib and asked him to conduct an investigation into Farah's conduct.  Ex. D, Andalib Depo. Tr. 54:1-5; 55:12-19; Ex. C, Rocha Depo. Tr. 183:21-25; 184:1-12.

22.     Andalib began investigating the allegations the very same day by interviewing Lopez, Alicia Serrano, Chandra Acharya, and Khin Ou.  Ex. D, Andalib Depo. Tr. 58:11-17.

23.     Lopez told Andalib that Farah regularly asked her to replace female employees on the line, including Efrah Abdellah, so the female employees could go talk to Farah.  ***Exhibit F***,

Active/44055969.1

Marietta Herrera Lopez March 10, 2015 Statement.[3]  Lopez described three recent examples of Farah directing her to fill in for Abdellah on the line and Abdellah being gone from her position for nearly two hours on one occasion, from the beginning of the shift until break on another occasion, and all day on the third occasion.  *Id.*  Lopez reported this conduct had been going on for several months, and, although she could not recall the dates, there were many other instances of Farah instructing her to perform Abdellah's job duties while Abdellah was with Farah in the training room.  *Id.*  Lopez also confirmed that supervisors were primarily responsible for sending their employees up to training, and it was not Farah's responsibility to call specific individuals to the training department.  *Id.*

24.     Alicia Serrano reported to Andalib that, on six or seven separate occasions, she too had been directed by Farah to replace Abdellah on the production line so Abdellah could report to the training room.  ***Exhibit G***, Alicia Serrano March 10, 2015 Statement.  Each time, Abdellah was with Farah for at least an hour.  *Id.*  One day, Serrano witnessed Farah touch Abdellah on the elbow and tell her to come with him, to which Abdellah replied, "again."  *Id.*  Serrano perceived that Abdellah was embarrassed.  *Id.*  Serrano also reported that, on Thursday, March 5, 2015, she had spoken with Anab Ali[4] who told her that she had been with Farah "kissing."  *Id.*

---

[3] Andalib himself wrote some of the witness statements based on what was reported during the interview.  His practice was to ask the employee to read the statement to ensure it was accurate, and to sign the statement affirming that everything was accurate.  Ex. D., Andalib Depo. Tr. 201:16-25; 202:1-10; Ex. C., Rocha Depo., Tr. 217:18-25; 218:1-5.

[4] When Serrano first gave the statement to Andalib she could not remember Ali's name and referred to her as the "tall girl."  Ex. G, Serrano Statement.  After giving that statement, however, Serrano reported to Rocha and Andalib that the "tall girl" was Anab Ali.  Ex. C, Rocha Depo. Tr. 210:2-22.

Active/44055969.1

25.     Chandra Acharya reported to Andalib that for the previous two to three months, and at least twice a week, Farah had been bringing Abdellah up to the training room and locking the door with just the two of them inside for multiple hours at a time.  **Exhibit H**, Chandra Acharya March 10, 2015 Statement.  On one occasion, Acharya witnessed Miguel Muniz open the door to the training room and immediately close it.  *Id.*  Once the door was closed, Acharya heard it lock from the inside.  *Id.*  About four minutes later, the door was unlocked and Farah and Abdellah walked out of the training room.  *Id.*

26.     Khin Ou told Andalib that when she was first hired, Farah brought her up to the training room on two separate occasions.  **Exhibit I**, Khin Ou Statement.[5]  On the second occasion, Farah made advances toward her and asked her to stay upstairs with him even though she did not need any training.  *Id.*  On other occasions, Farah directed Ou to replace Abdellah on the line for multiple hours so that Abdellah could go to the training room.  *Id.*  Like Lopez, Ou reported that she did not complain about Farah's behavior because she was afraid he would retaliate against her.  *Id.*

27.     The investigation continued on March 11, 2015, when Andalib and Rocha interviewed Farah.  Ex. A, Farah Depo. Tr. 72:13-25.  Andalib asked Farah about his interactions with Abdellah and why she was in the training classroom so frequently with the door closed and locked.  *Id.*  Farah claimed Abdellah was there to help interpret languages he did not speak, including Oromo, a language spoken by some Ethiopian employees.  *Id.*  Farah admitted he was friends with Abdellah from outside of work, and that the training room door would be closed

---

[5] Although the statement is undated, Rocha recalled that it was taken on March 10, 2015.  Ex. C, Rocha Depo. Tr. 225:10-25; 226:1-7.

Active/44055969.1

during some of his conversations with female employees.[6]  *See **Exhibit J**,* Andalib's Notes From Farah Interview; Ex. D, Andalib Depo. Tr. 99:15-24.  Farah also stated "it will never happen again" when he was asked about the allegations against him.  Ex. C, Rocha Depo. Tr. 164:16-25; 165:1-14.

28.     After the interview on March 11, 2015, Andalib and Rocha informed Farah that he was suspended.  ***Exhibit K***, March 11, 2015 Personnel Action Form; Ex. A, Farah Depo. Tr. 71:2-20; 73:4-12.

29.     Farah was suspended based on Rocha and Andalib's conclusion that he had misused company time and harassed female employees.  Ex. C, Rocha Depo. Tr. 167:8-20.

30.     Andalib and Rocha made the decision to suspend Farah.  Ex. C, Rocha Depo. Tr. 161:17-22.  At one point, Rocha raised the issue with Xasan, who responded that it was Rocha and Andalib's decision and they should make the "call" about what to do with Farah.  *Id.* at 162:1-19; 163:2-11.

31.     Although Xasan was in his office at the time, he did not attend the investigation interview or suspension meetings with Farah.  Ex. A, Farah Depo. Tr. 74:17-25; 75:12-19.

32.     After Farah's suspension, Andalib continued the investigation, interviewing Efrah Abdellah, Anab Ali, Abdelilah Karim, and Miguel Muniz.  Muniz reported that he personally witnessed Farah enter and exit locked rooms alone with female employees.  ***Exhibit L***, Miguel Muniz March 11, 2015 Statement.  On one occasion in December 2014, Muniz observed Farah

---

[6] Despite acknowledging in March 2015 that he had a personal relationship with Abdellah, Farah later testified he was not friends with Abdellah and she never came to the training department for personal reasons.  Ex. A, Farah Depo. Tr. 77:8-25; 78:1-25; 79:1-10.  Farah also denied that he ever met with female employees in the training room with the door closed.  *Id.*

and a female employee enter the Safety Trainer's office and lock the door. *Id.* Muniz reported that on March 10, 2015, he opened the door to the training room and saw Farah and a female employee in close proximity to one another. *Id.* While Farah was with the female employee with the door closed, trainer Chandra Acharya was teaching the training class by himself. *Id.* Muniz also reported that other employees complained to him about Farah removing a female employee from the line, leaving them to perform all of the work. *Id.*

33.    Efrah Abdellah admitted to Andalib that she had been in the training room for extended periods of time with Farah, and that this was a misuse of company time. ***Exhibit M***, Notes from Efrah Abdellah March 11, 2015 Interview. Abdellah said she would visit with Farah about personal issues, including getting advice regarding a lawyer for her mother. *Id.* Abdellah also told Andalib that Farah would lock the door while the two of them were in the training room, but she did not know why. *Id.*

34.    Abdelilah Karim confirmed that Farah regularly pulled Abdellah off the line to go to the training department and that, on some occasions, Abdellah refused to go with Farah. ***Exhibit N***, Abdelilah Karim March 13, 2015 Statement.

35.    Anab Ali told Andalib that Farah would call her to the training classroom and send Lopez to replace her on the line while she was gone. ***Exhibit O***, Anab Ali March 11, 2015 Statement. Ali also reported that Farah repeatedly asked for her telephone number and asked her out on dates, prompting her to change her telephone number three separate times. *Id.* In addition, Ali described Farah making daily "advances" to her in the hallway. *Id.*

36.    On March 12, 2015, Lopez and Serrano approached Rocha and Andalib and asked whether Farah would be returning to work. Ex. C, Rocha Depo. Tr. 248:3-25; 249:1-25. If so,

Lopez and Serrano indicated they would resign from their positions as Production Trainers and return to working on the line. *Id.* Lopez and Serrano explained that they did not feel comfortable working with Farah and were worried he would retaliate against them if he returned to work. *Id.*

**D.    Plaintiff's Discharge.**

37.    Based on the investigation, Andalib concluded, "Weli engage[d] in behavior that violates company policy.  Harassing female employees and using company time, property and resources for personal purposes."  ***Exhibit P***, Andalib Investigation Summary.

38.    Rocha expressed, "[e]specially in Weli's position and then as a member of management support and our zero-harassment policy at JBS, we couldn't just put this under the rug and pretend it wasn't there."  Ex. C, Rocha Depo. Tr. 255:18-25; 256:1.

39.    Rocha and Andalib believed Farah engaged in misconduct and violated JBS' policies.  Ex. C, Rocha Depo. Tr. 293:3-8.  As a result, Andalib and Rocha decided to terminate Farah for misusing company time and violating JBS' sexual harassment policy.  *Id.* at 253:17-25; 254:1-18; Ex. D, Andalib Depo. Tr. 170:19-22; Ex. P.

40.    Andalib did not confer with Xasan about the decision to terminate Farah.  Ex. D, Andalib Depo. Tr. 147:14-25; 148:1-22.  Xasan did not direct Andalib to discharge Farah.  *Id.* at 195:2-5.  Nor did Xasan direct or express any opinion to Rocha regarding whether Farah should be disciplined, suspended, or discharged.  Ex. C, Rocha Depo. Tr. 291:19-25; 292:1-5; Ex. E, Xasan Declaration, ¶ 7.

Active/44055969.1

41.     On March 13, 2015, Andalib called Farah to inform him that his employment with JBS was terminated.  *Exhibit Q*, March 13, 2015 Personnel Action Form.  Ex. A, Farah Depo. Tr. 88:8-45.

**E.     Yet Another Report of Egregious Harassment by Farah.**

42.     Following Farah's termination, on April 1, 2015, Ali approached Andalib along with Union Representative Adrianna Escobar and gave a second statement.  Ex. D, Andalib Depo. Tr. 158:12-25; 159:1-24.  Ali was not asked to give a second statement and JBS' investigation of Plaintiff had ceased at that point.  *Id.*  Ali reported that on one occasion, she was in a training class with Farah and other employees when Farah called her into another room where he proceeded to unzip his pants and expose himself.  *Exhibit R*, Anab Ali April 1, 2015 Statement.  Ali immediately left the room.  *Id.*  Ali reiterated that Farah followed her around the plant, harassed her, and forced her to change her telephone number several times because he repeatedly called her outside of work.  *Id.*  Ali explained that she was scared to complain earlier while Farah was still working at JBS.  *Id.*  Ali's Union Representative, Adrianna Escobar, was present for that interview.  *Id.*

**F.     Farah's Conduct Violated JBS' Policies.**

43.     JBS maintains an Employee Handbook, attached as *Exhibit S*.  Farah received a copy of the Handbook and signed a receipt, acknowledging he had read and understood it. *Exhibit T*, Employee Handbook Acknowledgement Receipt.  JBS also maintains a Code of Conduct, attached as *Exhibit U*.  Farah received and acknowledged his duty to read and understand the Code of Conduct.  *Exhibit V*, Code of Conduct Acknowledgement Receipt.

Active/44055969.1

44.     JBS' Employee Handbook contains specific equal employment opportunity ("EEO") and anti-harassment policies.  Ex. S, p. 6.  JBS' EEO Policy prohibits discrimination on the basis of sex, race, color, creed, age, national origin, disability, veteran status, or religious beliefs.  *Id.*  Similarly, JBS' anti-harassment policy prohibits harassment on the basis of the same protected characteristics.  *Id.*  The Code of Conduct also prohibits discrimination and harassment.  Ex. U, p. 5.  JBS' maintains a zero tolerance policy regarding harassment.  Ex. C, Rocha Depo. Tr. 255:18-25; 256:1.

45.     Because Farah translated the Handbook into Somali, he "kn[e]w everything about th[e] [hand]book."  Ex. A, Farah Depo. Tr. 56:2-19.  Farah was intimately familiar with JBS' policies and Code of Conduct because it was his job to train other employees on those exact policies.  Ex. A, Farah Depo. Tr. 60:6-12; *see also* **Exhibit W**, Harassment Alchemy Training Slides.

46.     JBS' Handbook also specifically prohibits the use of "company supplies, equipment, or resources for personal benefit or convenience" and warns that employees may be disciplined or discharged for violating this policy.  Ex. S, pp. 9-10.

**G.    Farah's Inconsistent Statements Following His Discharge.**

47.     Following his termination, Farah applied for unemployment benefits.  Ex. A, Farah Depo. Tr. 128:17-19.  Farah wrote in his application that he was fired because, "I was promised to get move[d] up within the company, and for that reason my co-trainer did not like that so he started act[ing] up and from that point on he started saying bad things about me." **Exhibit X**, Unemployment Benefits Application.  According to Farah, he was referring to

Active/44055969.1

another trainer, Miguel Muniz, who "was always that kind of person that would say things behind your back."  Ex. A, Farah Depo. Tr. 129:10-11; 130:8-25' 131:1-13.

48.    During his unemployment benefits appeal, Farah directed his lawyer to write, "No rule violated, employer lying.  It wanted to replace me with another employee and is using this as a pretext and thus constitutes unemployment fraud."  ***Exhibit Y***, Unemployment Benefits Appeal Statement; Ex. A, Farah Depo. Tr. 133:12-23.  Farah did not have another employee in mind when his lawyer wrote that JBS wanted to replace him with another employee.  Ex. A, Farah Depo. Tr. 135:4-8.

## ARGUMENT

**A.    Summary Judgment Standard.**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."  *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Adler*, 144 F.3d at 670-71.  In attempting to meet that standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

14

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256; *see also Adler*, 144 F.3d at 671 n.1. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671.

**B.      Plaintiff's Race And National Origin Discrimination Claims Fail.**

Farah alleges he was discharged based on his race and national origin in violation of Title VII and Section 1981. Comp., ¶¶ 27-40. These claims are based entirely on Farah's belief that Human Resources Director Maxamed Xasan held discriminatory bias toward him because they hail from different clans in Somalia, and thus Xasan "wanted him gone." Comp., ¶¶ 15-16; Ex. A (Farah Depo., Tr. 117:1-22). Indeed, all of Farah's allegations revolve around *Xasan's* alleged discriminatory bias. Farah makes no allegations, and there is no evidence, to support a finding that decision makers Andalib or Rocha held any discriminatory animus toward him. *See* Comp., ¶¶ 15-24. Farah's race and national origin discrimination claims fail as a matter of law.

i.      <u>Standard for race and national origin discrimination claims.</u>

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To survive a motion for summary judgment, a terminated plaintiff relying on indirect evidence of race or national origin discrimination must first establish a prima facie case by showing (1) he belongs to a protected class, (2) he was qualified to perform the job,

Active/44055969.1

(3) he was terminated, and (4) the circumstances surrounding his termination give rise to an inference of discrimination. *Baltazar v. Shinseki*, 485 F. App'x 941, 946 (10th Cir. 2012) (citing *Plotke v. White,* 405 F.3d 1092, 1099–1101 (10th Cir. 2005); *Carney v. City and County of Denver,* 534 F.3d 1269, 1273 (10th Cir. 2008) (identifying the elements for a race discrimination suit).

If the plaintiff meets this burden, the employer must articulate a legitimate, nondiscriminatory reason for the termination. *Id.* (citing *Mickelson v. N.Y. Life Ins. Co.,* 460 F.3d 1304, 1311 (10th Cir. 2006)). The burden then shifts back to the plaintiff to show "there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Id.* The elements for a race discrimination claim under Section 1981 are the same as the elements under Title VII. *Carney*, 534 F.3d at 1273.

Farah cannot maintain a prima facie case of race or national origin discrimination because the circumstances surrounding his termination do not give rise to an inference of discrimination as a matter of law. Moreover, Farah cannot show JBS' legitimate non-discriminatory reason for terminating his employment is pretext.

ii.    <u>Farah was fired for his own misconduct, not his race or national origin</u>.

Andalib and Rocha – not Xasan – made the decision to suspend and discharge Farah and, even accepting all of Farah's allegations as true, he cannot show his race or national origin were considered when Andalib and Rocha decided to terminate his employment.

a.    *There is no evidence Farah's race or national origin played any part in the decision to suspend and terminate his employment*.

There is no evidence to support a conclusion that Farah's race or national origin played any part in Andalib's and Rocha's decision to suspend and terminate his employment. Indeed,

Active/44055969.1

Rocha did not know where Farah was born, his country of origin, or his ancestry, and never spoke with employees about such things. Ex. C (Rocha Depo. Tr. 90:24-25; 91:1-17; 92:7-11). Similarly, although Andalib knew Farah was from Somalia, he did not know whether Farah was from Northern or Southern Somalia, and he had never heard of Somaliland. Ex. D (Andalib Depo. Tr. 41:6-25; 42:10-13). In short, there is no evidence – circumstantial or otherwise – to suggest Farah's race or national origin had anything to do with Andalib and Rocha's decision to suspend and terminate Farah's employment.

To the contrary, Farah was terminated following a multi-day investigation in which Andalib and Rocha interviewed numerous employees, received multiple witness statements, and weighed and considered the information they uncovered concerning Farah's conduct. *See* SUMF[7] ¶¶ 17-37. Through the investigation, Andalib and Rocha learned that Farah regularly called female employees away from the line for personal reasons, took female employees into various rooms and offices where he would spend time alone with them with the door locked, and made repeated and unwanted advances toward Ou and Ali. *See* SUMF, ¶¶ 17-33. Ali reported she changed her telephone number three separate times because of Farah's harassment. *See* SUMF, ¶ 33. Based on their investigation, Andalib and Rocha reasonably concluded Farah engaged in misconduct and violated JBS' policies. Nothing about this investigation or the information obtained supports an inference of discrimination.

        b.      *Andalib and Rocha made the decision to suspend and discharge Farah.*

Farah's claims focus *entirely* on Maxamed Xasan and his alleged discriminatory animus toward Farah. *See* Comp., ¶¶ 15-24. Farah has not made a single allegation against Rocha or

---

[7] "SUMF" refers to the Statement of Undisputed Material Facts, *supra*.

Andalib suggesting they held discriminatory animus against him or that they terminated his employment because of his race or national origin.

"A plaintiff must demonstrate a nexus exists between the allegedly discriminatory statement and the [Defendant's] termination decision, and therefore 'that [race and national origin] actually played a role in the defendant's decision-making process and had a determinative influence on the outcome.'" *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000) (quoting *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir.1994). "[Race]-related [or national origin-related] comments by non-decisionmakers are not material in showing the [employer's] action was based on . . . discrimination." *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994); *see also Figures v. Board of Pub. Utils. of the City of Kansas,* 967 F.2d 357, 360 (10th Cir. 1992) ("evidence of racial comments made by [two individual defendants] was not probative of any issue in the case unless [the plaintiff] could link those comments to personnel actions of hiring, firing and promoting").

Andalib and Rocha alone made the decision to suspend and discharge Farah.  Ex. C (Rocha Depo. Tr. 161:17-22; 253:17-25; 254:1-18; 260:6-8); Ex. E (Xasan Decl., ¶ 7).  Andalib did not confer with Xasan regarding the decisions.  Ex. D (Andalib Depo. Tr. 147:14-25; 148:1-22).  Xasan did not direct Andalib to suspend or discharge Farah.  *Id*. at 195:2-5.  Nor did Xasan direct or express any opinion to Rocha regarding whether Farah should be disciplined, suspended, or discharged.  Ex. C (Rocha Depo. Tr. 291:19-25; 292:1-5).

Rocha attempted to speak with Xasan to get his input at one point, and Xasan responded that it was Rocha and Andalib's decision and they should make the "call" about what to do with Farah.  Ex. C (Rocha Depo. Tr. 162:1-19; 163:2-11).  While Xasan was in his office and could

have joined the meeting when Andalib and Rocha suspended Farah, he did not do so, which is further evidence that he was not involved in the decision to discipline Farah. Ex. A (Farah Depo. Tr. 74:17-25; 75:12-19). Because Xasan was not a decision maker, any allegedly discriminatory motive attributable to him is irrelevant.

In an analogous case involving allegations of national origin discrimination based on comments made by plaintiff's direct supervisor, but not attributable to the individual who made the employment decision, Chief Judge Krieger stated:

> While the Court can sympathize with the Plaintiff over the difficulties of working under a jingoistic supervisor, the Plaintiff has failed to adduce evidence that would suggest that her termination—or any other adverse employment action—occurred under circumstances giving rise to an inference that the decisionmaker—Wooten—acted with discriminatory animus. Accordingly, the Plaintiff has failed to show that she can establish a *prima facie* case, and the Defendant is entitled to summary judgment on her claim of national origin discrimination.

*Endahl v. Vinnell Corp.*, 2006 WL 57496, at *5 (D. Colo. Jan. 10, 2006) (internal footnote omitted). Similarly, Farah has failed to adduce any evidence suggesting that the actual decision-makers, Andalib and Rocha, acted with discriminatory intent. As such, Farah cannot present a prima facie case.

        c.      *Farah's own varying stories undermine any inference of discrimination.*

Even Farah's own statements made shortly after his discharge undermine his claims of race and national origin discrimination. Prior to filing his Complaint, Farah claimed he was terminated because he "was promised to get move[d] up within the company, and for that reason my co-trainer did not like that so he started act[ing] up and from that point on he started saying bad things about me." Ex. X (Unemployment Application). In another form, Farah claimed JBS "wanted to replace [him] with another employee and is using this as a pretext and thus

constitutes unemployment fraud." Ex. Y (Unemployment Appeal Statement); *see also* Ex A (Farah Depo. Tr. 133:12-23). Thus, according to Farah's own statements immediately following his discharge, he was not terminated because of his race or national origin, but because another employee was jealous of his success and made complaints to JBS about him. Indeed, at no point in his unemployment benefits proceedings, did Farah allege his discharge had anything to do with his race or national origin.

During his deposition, Farah told yet another version of his story when he claimed he was terminated and retaliated against because he reported a man for a safety violation who was, apparently, a Somalian friend of Xasan's. Ex. A, Farah Depo., Tr. 143:2-15. And during the EEOC's administrative proceedings, Farah claimed he was terminated for giving a deposition in a 2008 matter. *Id.* at 141:14-25; 142:1-25; 143:1-20. While denying in his deposition that he was terminated for giving a deposition, Farah admitted that he told the EEOC investigator that was the reason for his termination. *Id.* at 143:16-19. Since Farah's employment was terminated, he has provided different reasons for his discharge in different forums and at different times. None of Farah's explanations, however, relate to his race or national origin. Because there is no evidence to support an inference of discrimination relating to Farah's suspension or discharge he cannot establish a prima facie case.

d.    *Farah's allegations do not relate to his race or national origin.*

Even if Farah could tie his suspension or discharge to Xasan – which he cannot – Farah's allegations are insufficient to show that Xasan held discriminatory animus toward him or that Farah's discharge had *anything* to do with his race or national origin. Farah provided the following examples of situations which he believes demonstrate Xasan's discriminatory animus:

Active/44055969.1

- Xasan told Farah he was not qualified for a training department supervisor position and hired Rocha for that position.  Ex. A (Farah Depo. Tr. 97:4-25; 98:1-22).

- Xasan asked Farah political questions about Somalia, including, "Why would Somaliland want to be the only independent government"? and "Why can't we just stick together"? and "Why won't you guys let refugees back into your country"?  *Id*. at 108:8-25; 109:1-9; 112:20-23.

- Xasan requested that Farah get him a frock.  *Id*. at 109:15-25; 110:1.

- Xasan stated that he is the "HR director" and "not that loyal like you guys" regarding another employee, Olivia Mercado.  Apparently, Xasan told Farah that Mercado needed to come to his office to see him if she had a problem regarding her vacation.  *Id*. at 110:2-25.

- Unidentified "community leaders" in Greeley met with Xasan and wanted Farah removed from the plant, as well as other employees at JBS who were unhappy with Farah because Farah would not show them "favoritism."  *Id*. at 117:23-25; 118:1-14; 121:10-24.

Accepting these allegations as true, none of them is tied to Farah's race or national origin.  Rather, the alleged comments relate to Farah's education and qualifications, politics, and apparent unwillingness to show favoritism, as well as Xasan's perception that he should not be "loyal" to employees because he was the Human Resources Director.  The examples Farah relies upon to demonstrate discriminatory animus are nothing more than stray remarks unrelated to Farah's protected characteristics.

The only purported comment that even touches on Farah's country of origin is Xasan's alleged political questions regarding Somalia.  Ex. A (Farah Depo. Tr. 108:8-25; 109:1-9; 112:20-23).  However, even these comments are unrelated to Farah's national origin and cannot support his Title VII claim.  *See E.E.O.C. v. Peabody W. Coal Co.*, 773 F.3d 977, 988 (9th Cir. 2014) ("We conclude that Title VII does not prohibit differential treatment based on tribal affiliation, the political classification at issue here.").  Moreover, those questions do not suggest

Active/44055969.1

any animus toward Northern Somalia or Somaliland and, instead, reveal nothing more than Xasan's interest in understanding Farah's perspective on his home region.

Farah will also likely argue Xasan's purported discriminatory intent can be gleaned from his alleged statement to Brandon Sellers that Sellers needed to "get rid of Weli." ***Exhibit Z***, Deposition Transcript of Brandon Sellers ("Ex. Z, Sellers Depo. Tr.") 9:4-25; 10:1-23. While JBS disputes that Xasan ever made such a demand, even assuming, *arguendo*, he did so, it does not support Farah's claims.

First, it is undisputed that Farah was not terminated as a result of that statement. Indeed, Sellers testified that he refused to follow Xasan's purported order. *Id*. Second, there is no evidence that Xasan's purported instruction to "get rid of Weli" was motivated by Farah's race or national origin. Rather, according to Sellers, when he asked Xasan why he wanted to terminate Farah, Xasan replied he had "heard enough about him." Ex. Z (Sellers Depo. Tr. 10:10-16). Xasan never explained to Sellers what he allegedly "heard" about Farah nor indicated that his request had anything whatsoever to do with Farah's race or national origin. *Id*. at 10:17-21. Sellers inferred Xasan was referring to comments made within the "community." *Id*. at 95:7-25; 96:1. Sellers explained that the term "community" referred to the Muslim community, and that Farah had made enemies within that community because he "called them out for cheating the system" at JBS. *Id*. at 56:19-25; 57:1-16; *see also* 68:12-19 (Sellers' testimony that "community" referred to the Muslim community, which he believes included some Somali individuals).

Thus, the "community" is a religious affiliation unrelated to an individual's national origin. Further, the alleged reason Farah had enemies at JBS was because he reported employees

who violated policies.  As such, neither the "community" itself nor the basis for Farah's alleged enemies within the "community" are related to Farah's race or national origin.  Farah cannot avoid summary judgment by relying on a vague comment to "get rid of Weli" when that alleged directive did not come to fruition and the apparent reason behind it had nothing whatsoever to do with Farah's race or national origin.

As such, accepting Farah's allegations as true and assuming, *arguendo*, that Xasan was involved in the decision to terminate his employment, Farah fails to adduce any evidence that Xasan held animus toward him because of his race or national origin.  Farah is unable to state a prima face case and his Complaint must be dismissed with prejudice.

    iii.    <u>Farah was terminated for a legitimate non-discriminatory reason.</u>

Assuming Farah could state a prima facie case of discrimination, which he cannot, the burden shifts to JBS to present a legitimate, non-discriminatory reason for Farah's suspension and termination.  *Baltazar*, 485 F. App'x at 946.

As described above, on March 10, 2015, JBS began an investigation into Farah's conduct after Rocha was informed that Farah regularly directed Lopez to fill in for female production employees for hours at a time, which caused Lopez to frequently be away from her work station, and that Farah often took female employees into the back room, as well as the Safety Trainer and Rocha's offices alone and locked the door once inside.  Ex. C (Rocha Depo. Tr. 175:15-25; 176:1-2; 177:5-15; 197:16-25; 198:1-2).  As soon as Rocha learned of these issues, she approached Andalib who began an investigation.  *Id*. at 183:21-25; 184:1-12; Ex. D (Andalib Depo. Tr. 54:1-5; 56:12-21).

Andalib's investigation not only confirmed the complaints Rocha had received, but uncovered additional allegations of inappropriate conduct by Farah. For example, several Production Trainers told Andalib that they too were directed by Farah to fill in for female employees while those employees went to the training department. *See* Ex. F (Lopez Statement); Ex. G (Serrano Statement); Ex. I (Ou Statement); Ex. N (Karim Statement); Ex. O (Ali Statement).

Abdellah admitted she would be in the training room for extended periods of time with Farah and that it was a misuse of company time. Ex. M (Abdellah Interview Notes). Abdellah also said she would visit with Farah in the training classroom about personal issues and that Farah would lock the door while the two of them were alone in the training room. *Id.* Ou also complained that Farah summoned her to the training room and told her she did not need training, but could stay with him in the training room alone. Ex. I (Ou Statement). While in the training room, Farah made advances toward her. *Id.* Serrano reported that she spoke with Ali who stated she had been with Farah "kissing." Ex. G (Serrano Statement). Ali told Andalib that Farah repeatedly asked for her number and asked her out on dates. Ex. O (Ali Statement). Ali also complained that she changed her telephone number three separate times because of Farah's harassment and that he made daily advances on her the hallway. *Id.* Several employees revealed that they had not complained about Farah's conduct out of fear of reprisal. Ex. C (Rocha Depo. Tr. 178:22-25; 179:1-8); *see also* Ex. I (Ou Statement).

Other Classroom Trainers confirmed Farah's misconduct. Acharya reported that for the previous two to three months, Farah would bring Abdellah to the training room at least twice a week and lock the door with just the two of them inside for multiple hours at a time. Ex. H

(Acharya Statement).   On one such occasion, Acharya witnessed Classroom Trainer Miguel Muniz open the door to the training room and immediately close it.   *Id.*   Once the door was closed, Acharya heard it lock from the inside.   *Id.*   About four minutes later, the door was unlocked and Farah and Abdellah walked out of the training room.   *Id.*   Similarly, Muniz recounted that he had seen Farah and a female employee enter the Safety Trainer's office and lock the door with just the two of them inside.  Ex. L (Muniz Statement).   Muniz also stated that on March 10, 2015, he opened the door to the training room and saw Farah and a female employee alone in the room and in close proximity to each other, which left Acharya to teach the training class by himself.  *Id.*

Andalib and Rocha met with Farah to get his version of events.   During their conversation on March 11, 2015, Farah admitted he was friends with Abdellah from outside of work and that the training room door would be closed during some of his conversations with female employees.  Ex. J (Andalib Notes From Farah Interview).   Farah apologized and insisted "it will never happen again."[8]  Ex. C (Rocha Depo. Tr. 164:16-25; 165:1-14).

Based on the investigation, Andalib concluded that Farah violated JBS' policies by harassing female employees and misusing company time for personal purposes.  Ex. P (Andalib Investigation Summary).   Similarly, Rocha concluded, "[e]specially in Weli's position and then as a member of management support and our zero-harassment policy at JBS, we couldn't just put this under the rug and pretend it wasn't there."   Ex. C (Rocha Depo. Tr. 255:18-25; 256:1).   Ultimately, Farah's employment was terminated for misuse of company time and violating JBS'

---

[8] Notably, after Farah was suspended, Lopez and Serrano told Rocha and Andalib that they would resign as Production Trainers if Farah returned to work.  Ex. C (Rocha Depo. Tr. 248:3-25; 249:1-25).   Both employees were so uncomfortable working with Farah that they would rather take a demotion than continue working with him on a daily basis.

Active/44055969.1

sexual harassment policy.  Ex. C (Rocha Depo. Tr. 253:17-25; 254:1-18); Ex. D (Andalib Depo. Tr. 170:19-22); *see also* Ex. Q (March 13, 2015 Personnel Action Form).

Farah's misuse of company time and harassment of female employees were legitimate and non-discriminatory reasons for his discharge.  *See White v. Oklahoma*, 552 F. App'x 840, 849 (10th Cir. 2014) (affirming district court's determination that defendant had legitimate, non-discriminatory reason to discharge plaintiff because plaintiff violated defendant's policies and procedures); *Bellairs v. Coors Brewing Co.,* No. 95–1486, 1997 WL 107767, at *3 (10th Cir. March 12, 1997) ("[The Defendant], however, met its subsequent burden by establishing a legitimate, non-discriminatory reason for terminating Bellairs; gross misconduct in the form of sexual harassment.") (citations omitted); *Wheeler v. Aventis Pharms.,* 360 F.3d 853, 858 (8th Cir. 2004) ("We agree that an employee's termination for violation of a sexual-harassment policy could be a legitimate, nonracially discriminatory basis."); *Waggoner v. Garland,* 987 F.2d 1160, 1164 (5th Cir. 1993) ("The City justified the discharge on the basis of the allegations of [plaintiff's] sexual harassment of Connor, on its face a legitimate and nondiscriminatory reason."); *DiMaggio v. State of Oklahoma ex rel. Dep't of Cent. Servs.*, 2009 WL 2871085, at *5 (W.D. Okla. Sept. 1, 2009) ("As set forth above, defendant has articulated a legitimate, nondiscriminatory reason for the adverse actions—plaintiff's alleged continued violations of policy and procedure.").

    iv.    <u>Plaintiff cannot show JBS' legitimate non-discriminatory reasons are pretext.</u>

Even if Farah could establish a prima facie case, his claims still fail because he cannot prove JBS' legitimate, non-discriminatory reasons for terminating his employment are pretext. Generally, "[a] plaintiff demonstrates pretext by producing evidence of such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Sanders v. Southwestern Bell Telephone, L.P.,* 544 F.3d 1101, 1106 (10th Cir. 2008) (citation omitted). "Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment. Mere conjecture that the employer's explanation is pretext is insufficient basis to defeat summary judgment." *Jencks v. Modern Woodmen of America,* 479 F.3d 1261, 1267 (10th Cir. 2007) (citation and quotations omitted). The Tenth Circuit has consistently held that "unsupported assertions by an employee that an employer's actions are based on his race [or national origin] are insufficient to avoid summary judgment." *Domai v. Discover Financial Services, Inc.*, 244 F. App'x. 169, 174 (10th Cir. 2007).

Farah cannot satisfy his burden. There is simply no evidence supporting an inference that Farah was discharged because of his race or national origin. Instead, the undisputed evidence indicates that Farah was terminated based on Andalib and Rocha's reasonable and good faith conclusion, following their investigation, that Farah misused company time and harassed female employees.

Further undermining any pretext argument, Farah and Xasan share the same race and national origin.[9] It is undisputed that Xasan and Farah are both black African-Americans who

---

[9] The Supreme Court long ago held that "national origin" under Title VII refers to a person's country of birth or his ancestors' country of birth. See *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973). Both Farah and Xasan were born in Somalia and, therefore, they have the same "national origin." As described below in Section C, Farah's attempt to distinguish his country of origin from Xasan's based on geographical location is unpersuasive.

were born in Somalia. Ex. A (Farah Depo. Tr. 54:2-12; 135:20-25; 136:1-9); Ex. E (Xasan Decl., ¶ 3). Although not dispositive, "[a] plaintiff may have difficulty establishing discrimination where the alleged discriminatory decision-maker is in the same protected class . . . ." *Kendrick v. Penske Transp. Servs., Inc.*, 1999 WL 450886, at *8 (D. Kan. Apr.13, 1999), *aff'd*, 220 F.3d 1220 (10th Cir.2000). "[P]roof that the decision-maker is the same race as the [P]laintiff considerably undermines the probability that race was a negative factor in the employment decision." *Almon v. Goodyear Tire & Rubber Co.*, 2009 WL 1421199, at *7 (D. Kan. May 20, 2009) (collecting cases); *see also Estate of Bassatt v. Sch. Dist. No. 1 in the City & Cty. of Denver*, 775 F.3d 1233, 1241 (10th Cir. 2014) (finding plaintiff and the decision-maker were in the same protected class which "undermines any suggestion of pretext."); *Anderson v. Guar. Bank & Trust Co.*, 2015 WL 5915366, at *10 (D. Colo. Oct. 9, 2015) ("Although members of a protected class may at times discriminate against other members of that same class . . . the inference of discrimination is weakened when the decision maker is within the protected class."). The fact that Farah and Xasan share protected classes, coupled with Farah's inability to garner any evidence supporting an inference that race or national origin played a role in his termination, preclude a finding of pretext.

Farah claims he needed the female employees in the training department to help interpret and, therefore, he did not violate JBS' policies. This argument misses the point. "The Court affords substantial latitude to employers in making discipline related decisions, and is reluctant to 'act as a super personnel department that second guesses employers' business judgments.'" *Wells v. Dynamic Restaurants LLC*, 2006 WL 118397, at *9 (D. Colo. Jan. 13, 2006) (quoting *Salguero v. City of Clovis,* 366 F.3d 1168, 1177 (10th Cir. 2004)). Thus, even if JBS was

28

mistaken in its judgment that Farah misused company time and harassed employees, "a mistaken belief or motive can be a legitimate reason for an employment decision" and is not necessarily deemed a pretense for discrimination. *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1322 n.12 (10th Cir. 1992). Indeed, under well-established Tenth Circuit law, the court does not examine whether [defendant's] analysis of Farah's [conduct] was "wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999).

Farah can point to no evidence that Andalib and Rocha did not honestly believe he misused company time and harassed female employees at the time they terminated his employment. It is undisputed that multiple employees reported to Andalib and Rocha that Farah took female employees into various rooms and offices alone and locked the door. It is undisputed that employees told Andalib and Rocha during their investigation that Farah flirted with Ali and Ou while at work, harassed Ali out of the office so frequently that she changed her telephone number three times, and spoke with Abdellah regarding personal issues in the training room.[10] Based on this information, Andalib and Rocha reasonably concluded Farah misused company time and harassed female employees. Accordingly, Farah cannot show JBS' legitimate and non-discriminatory reasons for terminating his employment were pretext for discrimination.

---

[10] Moreover, even if Farah was merely using the female employees as translators, he failed to follow proper protocol to do so. It is undisputed that Farah, like all Classroom Trainers, did not have the authority to remove a production employee from the line to perform translating services. Ex. C (Rocha Depo. Tr. 283:1-16). Rather, if a Classroom Trainer needed help translating, he was expected to speak to Rocha who would communicate with the Production Superintendent and make sure the employee may be removed from the line. *Id.* Farah never communicated with Rocha or any superintendent in an effort to get help translating.

Active/44055969.1

*See Locke v. Grady County,* 437 F. App'x 626, 631–33 (10th Cir. 2011) (facts appearing to decision-maker at the time provided a legitimate, non-discriminatory reason for firing plaintiff).

**C.      Plaintiff's Regional Discrimination Theory Does Not State a National Origin Discrimination Claim.**

In addition, Farah's rather unique theory of regional bias between Somalis fails to state a cognizable claim of national origin discrimination.  Farah testified that Xasan did not want him to work at JBS because Xasan "is a southern Somalian."  Ex. A (Farah Depo. Tr. 98:23-25; 99:1-9).  Farah also claimed Xasan wanted to replace him with someone from the Southern part of Somalia.  Ex. A (Farah Depo. Tr. 134:4-10).  The allegations in Farah's Complaint focus on the region in Somalia where he is from, as compared to the region from which he believes Xasan is from.  *See* Comp., ¶¶ 8 & 15.  Thus, the crux of Farah's claim is that Xasan discriminated against him because Farah is from the Northern region of Somalia and Xasan is from the Southern region.  Regional discrimination, however, is not national origin discrimination and is not unlawful under Title VII.

Courts have uniformly rejected attempts to establish a national origin cause of action based on regionalism.  For instance, in *Dollman v. Mast Indus.*, 731 F. Supp. 2d 328 (S.D.N.Y. 2010), plaintiff was a British citizen from Essex County, England, and her direct supervisor was from West Midlands County, England.  The plaintiff sued alleging national origin discrimination.  The court found that, as a rule, "regional" discrimination was not within the ambit of Title VII's prohibition of national origin discrimination.  In so holding, the court noted that despite the inclusiveness of Title VII, discrimination on the basis of a person's regional heritage does not typically fall under coverage for "national origin."  *Id.* at 335-336 (citing *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 89 (1973) for the Court's recognition of Title VII's

30

legislative history and statement that "[t]he only direct definition given the phrase 'national origin' is the following remark made on the floor of the House of Representatives by Congressman Roosevelt, Chairman of the House Subcommittee which reported the bill: 'It means the country from which you or your forebears came . . . . You may come from Poland, Czechoslovakia, England, France, or any other country.'").

In *Bronson v. Bd. of Educ. of the City Sch. Dist. of Cincinnati*, 550 F. Supp. 941 (W.D. Ohio 1982), the court similarly found that national origin discrimination was not intended to include Appalachians or other such groups who do not possess a national origin distinguishable from that of other citizens of the United States. The court found that while Appalachians share certain characteristics, including family structure, religion, and neighborhood structure, they do not have a common national origin other than that which they share with the general population of this country. *Id.* at 946.

Other courts have reached a similar conclusion. *See e.g., Fox v. Shinseki*, 2013 WL 4034086, at *7 (N.D. Cal. Aug. 6, 2013) ("Discrimination based on national origin is barred by Title VII; discrimination based on regional origin is not."); *Chaplin v. Du Pont Advance Fiber Sys.*, 293 F. Supp. 2d 622 (E.D. Va. 2003) (holding that plaintiff's national origin claim failed because "Confederate-American" is not a protected class); *Williams v. Frank*, 757 F. Supp. 112 (D. Mass. 1991) (holding that "Southernness is not a protected trait").

Even the EEOC has rejected claims based on a claimant's state or region of origin. For example, in *DeWitt v. Rubin*, 1995 WL 481354 (EEOC 1995), the complainant claimed that he was discriminated against because he was "a Southerner in general, and a Kentuckian in particular," and his supervisor was biased against Kentuckians. The EEOC dismissed his claim,

finding that his alleged national origin of "American-Kentuckian" was not cognizable under Title VII. *Id. at * 2.*

Similarly, in *Schumann v. Stone,* No. 01921683, (EEOC 1992) (p. 2, part c), complainant alleged she was discriminated against as "a 'Yankee' working among hostile 'Southerners.'" The EEOC noted that while its regulations defined "national origin" broadly, a claim of discrimination based on being a "Yankee" was not within the purview of Title VII. *See also Banks v. Widnall,* No. 01944161, 1994 WL 742623 (EEOC 1994) (finding that discrimination on the basis of being "from the north" and a "yankee" is not covered under Title VII); *Humiston v. Runyon*, 1994 WL 745792 n.1 (EEOC 1994) (finding that national origin claim based on "Northerner" claim was properly dismissed because "Title VII does not encompass regional origin").

Likewise, Farah cannot maintain a national origin claim based on his belief that Xasan held discriminatory animus toward him because Farah is from the Northern part of Somalia while Xasan is from the Southern part of Somalia. Farah's national origin claim fails as a matter of law.

**D.     If Farah's Claims Survive, His Recovery Is Limited By The After-Acquired Evidence Doctrine.**

Assuming, *arguendo*, Farah could present sufficient evidence to overcome summary judgment, his potential damages should be significantly limited pursuant to the after-acquired evidence doctrine. "The after-acquired evidence doctrine shields an employer from liability or limits relief where, after a termination, the employer learns for the first time about an employee's wrongdoing that would have caused the employer to discharge the employee." *Armani v. Maxim*

*Healthcare Serv., Inc.,* 53 F. Supp. 2d 1120, 1127 (D. Colo. 1999) (citing *Crawford Rehabilitation Serv., Inc. v. Weissman,* 938 P.2d 540, 546 (Colo. 1997)).

To determine whether damages should be limited on the basis of after-acquired evidence, the Court employs a two-step process. *Perkins v. Silver Mountain Sports Club & Spa, LLC*, 557 F.3d 1141, 1145 (10th Cir. 2009). First, the employer must demonstrate "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 362-63 (1995); *Ricky v. Mapco, Inc.*, 50 F .3d 874, 876 (10th Cir. 1995). Second, if the employer can make this initial showing, the after-acquired evidence may be considered to limit the damages available to a wrongfully terminated employee. *See McKennon*, 513 U.S. at 362.

On April 1, 2015, less than three weeks after Farah's discharge, Anab Ali approached Andalib along with Union Representative Adrianna Escobar and gave a second statement. Ex. D (Andalib Depo. Tr. 158:12-25; 159:1-24). In that statement, Ali reported that on one occasion, she was in a training class with Farah and other employees when Farah called her into another room. Ex. R (Ali April 1, 2015 Statement). Once in that room, Farah unzipped his pants and exposed himself to Ali. *Id.*

Although at the time Andalib and Rocha decided to terminate Farah, they had other allegations that Farah harassed Ali and other employees, it was not until Ali gave a second statement on April 1, 2015, that JBS learned Farah had exposed himself to her. JBS maintains a zero-tolerance harassment policy. Ex. C (Rocha Depo. Tr. 255:18-25; 256:1). Pursuant to this policy, Farah's outrageous conduct in exposing himself to a female employee on JBS' premises

33

would have resulted in Farah's immediate termination.   Applying the after-acquired evidence doctrine, Farah's compensatory damages should be limited to the income he would have earned during the period between March 13, 2015 and April 1, 2015.

## CONCLUSION

Based on the foregoing, the undisputed facts demonstrate Plaintiff's claims fail as a matter of law.   Accordingly, judgment should enter in favor of JBS and Plaintiff's Complaint should be dismissed with prejudice.

Dated this 7th day of November, 2016.

Respectfully Submitted,

*s/ Heather Fox Vickles*

Heather Fox Vickles
Jonathon M. Watson
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Phone:  (202-299-8194 – Vickles Direct
Phone: (303) 299-8286 – Watson Direct
Fax: (303) 298-0940
Email:  hvickles@shermanhoward.com
Email:  jwatson@shermanhoward.com

*Attorneys for Defendant*

Active/44055969.1

## <u>CERTIFICATE OF SERVICE/ECF</u>

I hereby certify that on this 7th day of November, 2016, I electronically filed the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

> Temitayo O. Okunade, Esq.
> Okunade, LLP
> 10200 East Girard Ave., Suite C250
> Denver, CO  80231
> Email:  tayo@okunadellp.com
> tayo@mountainwestlawgroup.com

> *s/ Lynn Zola Howell*　　　　　　　　　　　

Active/44055969.1