# Exhibit Z

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-CV-02387-RPM

---

DEPOSITION OF BRANDON SELLERS
EXAMINATION DATE:  AUGUST 10, 2016

---

WELI A. FARAH,
Plaintiff,
v.
JBS USA, LLC d/b/a SWIFT COMPANY,
Defendant.

---

　　　　PURSUANT TO NOTICE, the deposition of
BRANDON SELLERS was taken at 10:06 a.m. on August 10,
2016, at 733 Seventeenth Street, Suite 3000, Denver,
Colorado, before Nathan Stormo, Registered Professional
Reporter and Notary Public in and for the State of
Colorado, said deposition being taken pursuant to the
Federal Rules of Civil Procedure.


　　　　　　　　　　Nathan Stormo
　　　　　Registered Professional Reporter

Stormo Reporting, Inc.  (303) 200-4792

**EXHIBIT Z**

**Page 8**

1  look at this document that we've marked as Exhibit 44.
2  You have probably never seen that before, have you?
3     A   No.
4     Q   I will direct your attention to the first page
5  under Paragraph 1 there. It lists your name, and it
6  says "Address Unknown." So can you give us your current
7  address?
8     A   117 East 9th Avenue in Fort Morgan, Colorado,
9  and that's 80701.
10    Q   And is that your correct phone number?
11    A   Yes, ma'am.
12    Q   And if you read there it says that "Mr. Sellers
13 was a Training Supervisor and HR Manager on or about
14 March 2014. He may have knowledge and information
15 relevant to support Plaintiff's claims, including but
16 not limited to, Plaintiff's employment, JBS training
17 program, discrimination against Plaintiff by Mr. Max
18 Hassan, and use of translators at JBS." Did I read that
19 correctly?
20    A   Yes, ma'am, except I was the training manager,
21 not training supervisor.
22    Q   And what knowledge do you have to support
23 Mr. Farah's claims?
24    A   I don't know what Mr. Farah's claims are.
25    Q   And what knowledge do you have of

**Page 9**

1  discrimination against Mr. Farah by Max Hassan?
2     A   Well, do you want me to go through all my
3  issues with Max when it came to discrimination issues?
4     Q   Just what knowledge you have about
5  discrimination against Mr. Farah by Max.
6     A   So specifically I recall a conversation, it was
7  probably about, I don't know, three or four days after
8  Max had started. I was about to come out of my HR
9  office, and Max passed me. And he stopped me, and he
10 says, Hey, you need to get rid of Weli.
11       And I looked at him because, I mean, at first I
12 thought it was kind of a joke, right? Because, I mean,
13 here is my HR director telling me I need to fire
14 somebody, one of my employees, that I didn't have any
15 reason to fire the person. So I kind of thought it was
16 a joke. And I kind of smiled at him.
17       And he gave me this dirty look. And he was
18 like -- he is like, Do you have a problem with that?
19       And I said, Well, for what reason?
20       And that's when I started realizing that he was
21 serious. And he says, Well, I've heard enough things
22 about him to know that he needs to go.
23       And I said, Max, with all due respect, we don't
24 fire people based on knowing enough about somebody. We
25 have to have documentation. I did get a little snippy

**Page 10**

1  with him, because I couldn't believe my boss was asking
2  me to violate company policy and just get rid of
3  somebody like that.
4        And he got lippy with me back, and he says --
5  he says, Well, I'm your boss, and I'm telling you you
6  need to get rid of him.
7        And I said, What exactly have you heard about
8  him?
9        And he says, Well, I just heard enough.
10       I said, Max, with all due respect, you have
11 never even met him yet. How can you make a
12 determination I need to fire one of my employees when
13 you have never even met him?
14       That's when again he says, Look, I've heard
15 enough about him, and you need to do your job and do
16 what I tell you to do.
17    Q   So did he tell you any of the things he said he
18 had heard about Mr. Farah?
19    A   No.
20    Q   Did he share any details with you?
21    A   No.
22    Q   And did you terminate Mr. Farah's employment?
23    A   No, I did not.
24    Q   Did you ever discuss terminating Mr. Farah with
25 Max again?

**Page 11**

1     A   There was a few, like, side comments. I
2  wouldn't really call them discussions, like meetings or
3  anything.
4        I do recall one other instance where he had
5  told me where are you at on getting this stuff together
6  to fire Weli?
7        And that's again when I said, For what reason?
8  I don't have a reason to fire him. He hasn't done
9  anything. And that was kind of the end of the
10 conversation. Again, he just gave me a dirty look. But
11 there was never like -- there was never a meeting, a
12 formal meeting, an entire conversation or anything like
13 that.
14    Q   Okay. And did Mr. Xasan ever tell you why he
15 thought Mr. Farah should be terminated?
16    A   No.
17    Q   He just said, Get rid of Weli?
18    A   Yes.
19    Q   And you have no knowledge about what things he
20 had heard about Mr. Farah?
21    A   No.
22    Q   Okay. Anything else that you have knowledge of
23 that you think is discrimination against Mr. Farah by
24 Max Xasan?
25    A   Probably one other instance. I don't know if

56

1  Q  Did you have any discussions with Max Xasan
2  about why this employee was reinstated?
3  A  Yes. And Max told me it was none of my damn
4  business.
5  Q  Anything else?
6  A  He told me -- that I tried to offer him my
7  information, you know, of why we shouldn't bring this
8  guy back. This was -- this was within a couple of days
9  of Max starting that he was bringing this guy back. I
10  said, Did you talk to production?
11     No, I don't need to talk to production.
12     I'm like, Production does not want this guy
13  back either. The union does not want this guy back. We
14  don't want this guy back. Why are we brining this guy
15  back.
16     And he says, Look, it's my decision. I'm the
17  boss.
18     I was like, All right.
19  Q  Okay. Moving on to Paragraph 4, you say that
20  you remember Weli would call out other employees on
21  cheating the system?
22  A  Uh-huh.
23  Q  Can you remember who any of these other
24  employees were that were called out for cheating the
25  system?

57

1  A  What they were doing is abuse of company time
2  for religious accommodations, and so he was active in
3  trying to help us make sure that employees understood
4  they could not be abusing company time. So when they
5  took an unscheduled break, they needed to make sure to
6  stick it as close to 15 minutes as possible and get back
7  to work.
8  Q  Can you remember the names of any employees who
9  called out?
10  A  Not specifically. We had 3,200 employees.
11  Q  And you say it made him enemies within JBS?
12  A  It did.
13  Q  Who were his enemies?
14  A  The community.
15  Q  Which community?
16  A  The Muslim community.
17  Q  Any specific names?
18  A  I don't remember all their names.
19  Q  And then you say, "various employees would make
20  what I considered to be bonus claims against him at
21  work"?
22  A  Uh-huh.
23  Q  Which employees made bogus claims against Weli
24  at work?
25  A  Again, I don't remember all their names.

58

1  Q  Any --
2  A  Barb was involved in some of it.
3  Q  Can you remember any names of someone who --
4  A  There was 3,200 employees there. I don't
5  remember everybody's names.
6  Q  So answer my question, do you remember any
7  names?
8  A  No.
9  Q  Not one?
10  A  No.
11  Q  Any details of a specific claim you considered
12  bogus?
13  A  No, because I didn't investigate them. I had
14  Barb investigate them because he was my employee, so she
15  would take the investigation.
16  Q  Do you remember details or names about any one
17  specific complaint?
18  A  Not all that stuff. Barb handled it.
19  Q  Paragraph 5 we already talked about.
20  A  I lost a lot of respect for JBS right now. I
21  really have. Even to this guy over here, I'm telling
22  him that I want no part of this because I don't want to
23  fricking go against JBS, and you sit over here and you
24  tell me that they told you that I was going to quit in
25  two weeks. That's a lie. You show me documents, that

59

1  stuff is not accurate. That's not what was really going
2  on in this place. I raised the red flag over and over
3  again. OSHA could have been involved. The federal
4  government from FMLA could have been involved. Nobody
5  gave a crap. Nobody stood up for me when I trying to
6  raise red flags.
7     So you can show all these documents and
8  everything else, but I can tell you what was really
9  happening in that plant. You can mince words about
10  trying to remember people's names, but I'm telling you
11  there was corruption in that plant, and nobody gave a
12  crap.
13  Q  So, Mr. Sellers --
14  A  Except me.
15  Q  -- if you give me an answer to my questions,
16  this will be done. I'm trying to figure out whether you
17  have any additional knowledge, other than what you put
18  in your affidavit.
19  A  This was two years ago, 3,200 employees, and
20  most of the names when you're dealing with those people
21  are very, very similar. So trying to remember a name is
22  very difficult.
23  Q  I understand.
24  A  And when it came up to issues like that, at
25  that time Barb was the HR manager, I was the training

68

1  No, no. Max says I can.
2  So we brought it up to Max. We were like, Max,
3  we can't have people just coming through here uninvited
4  because we can't control it.
5  And he is like, Well, I said they can come back
6  here any time they want.
7  Q  Okay.
8  A  I agree with the premise of it, right, the
9  open-door, you know, I can see that part of it. But why
10  were we only allowing one group to do that if we're
11  going to do it at all.
12  Q  And do you know what group that is?
13  A  It was all the people from his community,
14  the -- I don't know how they would be classified. I'm
15  not an expert, but the Muslim community.
16  Q  Were those Somalians?
17  A  Yes -- well, I don't think it's just Somalians,
18  but it was the Muslim community. I'm sure some of them
19  were Somali.
20  Q  And did you get to form an impression where
21  exactly Weli was from during the time you worked with
22  him?
23  A  I believe he was from Somali.
24  Q  Any particular part of Somalia?
25  A  No. I do know there are different almost like

69

1  states within Somali. Not states themselves, but
2  sections. And so sometimes there is conflict between
3  those sections, and they don't see eye to eye, so we had
4  to kind of be careful sometimes. We would have
5  arguments amongst clans, I think is what they call them
6  or something.
7  Q  You would have arguments within JBS?
8  A  Yes.
9  Q  And did you witness Mr. Max show any favoritism
10  to any employees while you were there?
11  A  Yes.
12  Q  How so?
13  A  Well, for one was the guy that he brought back.
14  In my experience, that never would have happened, at
15  least without conversation, discussion with the people
16  that did the investigation, with production. That's
17  common practice to sit down and have that conversation.
18  And within, you know, two days he made a decision to
19  bring this guy back. And later on in further meetings
20  he kept saying, Well, you know, I'm giving the community
21  some -- some of the things that they want, and then they
22  will be more willing to work with me later.
23  And so he never said -- he never, I want to
24  make sure I'm clear on this, he never said he was
25  bringing that guy back as part of that, but the

70

1  impression I took from it was that was part of it.
2  Because like I said, further on into several months, he
3  had made that statement quite a few times that, Well,
4  we're giving them some things that they want, so they
5  will be more likely to help us when we need help.
6  Q  Was your impression at the time then that some
7  of the things that they wanted was Weli out of the
8  plant?
9  MS. VICKLES: Object to form.
10  A  I knew that's what they wanted.
11  Q  (By Mr. Okunade) Go ahead. How did you know
12  that?
13  A  From some of the things that came up that Barb
14  had to investigate, you know, and some of the things
15  that they had done and said about him. And we knew the
16  reasoning behind it. Barb is a straight shooter. I
17  mean, she's a no BS kind of woman. I've got a lot of
18  respect for her. And when she was sitting across the
19  table and saying, This ain't right, I knew it wasn't
20  right. I wasn't part of the investigation, but I knew
21  what was going on.
22  Q  And what was your understanding of what was
23  going on with respect to Weli?
24  A  Because Weli would not lie for anybody. Weli
25  would follow the policies and procedures. Now, I'm not

71

1  saying that Weli was a perfect person. Weli made a lot
2  of mistakes when I was his boss, but Weli was always
3  honest about it. He would always own up to things. He
4  would always tell me when he had done these things.
5  As an example, when I had -- wrote him up for
6  the abuse of company time, he sat across from my disk,
7  you know, he goes, I did it. I did it. I'm very sorry.
8  That's the type of person he was. And to see him
9  attacked because he is doing what is right for the
10  company, which is what I'm supposed to be doing, was
11  difficult to watch. But he didn't care about
12  nationality. He didn't care about race. He didn't care
13  about religion. He cared about making sure that company
14  did the right thing.
15  And if the company was in the wrong, he was the
16  first in my office, No, this ain't right. The
17  supervisor did that. But if the employee was in the
18  wrong, he was there doing the same thing. And he made
19  enemies within the community because the community
20  wanted its members to basically lie for each other, you
21  know, to help protect each other. And he wanted no part
22  of that. He was to do what was right, and that's why I
23  had so much respect for Weli.
24  Q  Do you remember if anyone ever came and
25  complained to you that Weli was keeping girls up in the

20 (Pages 68 to 71)

Stormo Reporting, Inc.  (303) 200-4792

92

1 the way to the door of my car.
2     Q   Sure. The employee that you were talking
3 about, was that a black employee?
4     A   I don't know if he was black or just like a
5 really dark Hispanic guy. I mean, he was -- I know he
6 was a Muslim guy. Again, when Max told me no more
7 escorts, he didn't say for certain people or anything
8 like that.
9     Q   Sure.
10     A   He said, blanket no more. I'm saying there is
11 no correlation between the two.
12     Q   I understand. Thank you.
13         While you were working at JBS, did you know of
14 any Muslims that were of Mexican descent?
15     A   No -- yes, I did. Yes, I did. Alexis -- he
16 was a supervisor, Alexis something. I can't remember
17 what his last name was, but he was a Muslim.
18     Q   Okay. But primarily when you were talking
19 about Muslims, you're talking about black people at the
20 plant?
21     A   Yes.
22         MS. VICKLES: Object to form on that last
23 question.
24     Q   (By Mr. Okunade) Was it a common practice
25 while you were there and while Max was there at JBS to

93

1 continue an investigation after terminating an employee
2 from JBS?
3     A   It could be. I mean, if the company sees a
4 potential liability, you know, if we terminate somebody
5 and then something else comes up, some new evidence
6 comes to light or the legal team at corporate comes down
7 and says, You know what, we might ought to go back and
8 shore up this part of the investigation or recheck some
9 of this. Potentially they could.
10     Q   Have you had that happen before while you
11 conducted an investigation at JBS?
12     A   Yes.
13     Q   And the reason would be to sort of plug the
14 hole, if you will, and --
15     A   Yes.
16         MS. VICKLES: Object to form.
17     Q   (By Mr. Okunade) Sorry. Let me finish. The
18 reason would be to plug the holes in the investigation
19 so JBS was not liable?
20         MS. VICKLES: Object to form.
21     A   Yes -- well, hold on. I wouldn't say not
22 liable. It's more just to make sure that we're
23 protecting the company.
24     Q   (By Mr. Okunade) Okay.
25     A   I don't like that word "not liable."

94

1     Q   Sure. And I don't want to put words in your
2 mouth?
3     A   Yes. It was just more to make sure we were
4 doing the right thing when I was there. If we made a
5 mistake, we would call it out. I mean, if the company
6 was in the wrong, we would do what was right.
7     Q   And what do you mean by that, you would call
8 the employee back?
9     A   Absolutely. We have done reinstatements
10 before. We have fired employees and then come back
11 and -- you know, something come down and new information
12 comes to light or something. It was like, you know
13 what? Maybe this employee should come back to work. So
14 it's not necessarily to protect the company. It's to do
15 what is right as well.
16     Q   And let me refer you back to your affidavit. I
17 just have a couple questions on that. It was Exhibit 46
18 that was handed to you today.
19         Now, you testified that I typed this exhibit
20 up, correct?
21     A   Or somebody from your office.
22     Q   Or somebody from my office.
23     A   Yes.
24     Q   Did I speak with you prior to sending this
25 affidavit to you?

95

1     A   Yes. We spoke.
2     Q   And you had a chance to look it over and make
3 changes as you saw fit?
4     A   Yes.
5     Q   And you did that?
6     A   Yes.
7     Q   On Paragraph 5 when you were talking about
8 Mr. Xasan coming to your office, or you passing him and
9 him telling you to get rid of Weli, then you also said
10 that all he told you was that he heard enough stories.
11 Did you form an impression of what stories he was
12 talking about?
13     A   I knew right away what he was referring to.
14     Q   What was your impression of that; what he was
15 referring to?
16     A   In my opinion -- he never told me this. In my
17 opinion, it was based off of the issues that had come up
18 with his community. I don't think I made that
19 conclusion right when he said it. I think it was more
20 probably like a week or two later, is when I started
21 forming those opinions. I mean, I didn't go, Oh, you
22 heard it from the community. It was more -- because I
23 remembered for a while going, I don't understand why he
24 wants me to get rid of him. I don't see it. So I kind
25 of thought about it for a while, so I don't think I

96

1 formed it right away. It was several weeks later.
2 Q Had any of your HR directors that you reported
3 to ever told you to fire somebody without meeting that
4 person?
5 A Ask that question again. I want to make sure I
6 understand.
7 Q Sure. During your tenure at JBS, had you been
8 approached by any other HR director, other than Max,
9 telling you to fire an employee without, A, justifying
10 it; or, B, meeting that employee?
11 MS. VICKLES: Object to form.
12 A No.
13 Q (By Mr. Okunade) Okay.
14 A I had been asked to terminate employees that I
15 didn't do the investigation on. As an example, say Barb
16 did an investigation or whatnot, and she had a doctor's
17 appointment and had to leave early, so the person was
18 supposed to come in, and I would end up firing the
19 person. So I have been told to fire people before that
20 I had no part in. But the investigation was all done.
21 It was just a formality to terminate the employee.
22 Q And at the time that Mr. Max told you to get
23 rid of Weli, was there an investigation going on
24 regarding Weli?
25 A No.

97

1 MS. VICKLES: Object to form.
2 THE DEPONENT: Sorry.
3 A No.
4 Q (By Mr. Okunade) Let me ask you this: In your
5 opinion as a former JBS training supervisor and then
6 manager and then HR manager, if an employee came to you
7 to complain that somebody was asking her -- let's say
8 the employee is female. If a female employee comes to
9 you and says, So and so is asking me about my phone
10 numbers, okay, or asking me for phone numbers, hitting
11 on me, if you will. How would you handle that scenario?
12 A All right. So I'm going to need you to re-ask
13 your question.
14 Q Sure. I'm creating a scenario for you, all
15 right?
16 A Right.
17 Q Let's assume for a second a JBS female employee
18 comes to you and says, So and so is hitting on me.
19 A Uh-huh.
20 Q How would you handle that investigation?
21 Let me ask you, first of all, would you
22 consider that harassment?
23 A At that point with the information you've given
24 me, no. I would sit down and start talking to the
25 employee. I've got to determine if it's harassment.

98

1 Has she let the other person know that this is unwanted.
2 Please leave me alone, or, You know what? I'm not
3 interested in talking about that stuff at work. Has
4 that boundary been set, and is that employee violating
5 that boundary. Has she notified any other members in
6 management and nothing has happened? It just may be
7 unwelcome at that point.
8 Depending on what information coming out of
9 that investigation is going to determine which direction
10 I've got to go with it. Regardless I'm going to have a
11 conversation with the other employee, right, because I
12 need to make sure that they understand that this is
13 unwelcome at this point. So let's say, for example, the
14 employee says, No, I haven't spoken to anybody else. I
15 haven't spoken to the employee and let them know that
16 this is unwelcomed.
17 Okay. Let me let you know what we're going to
18 do. And I'm going to -- I will go ahead and have that
19 conversation with the other employee and let them know.
20 If you have any other issues, don't hesitate to get with
21 us and let us know that this is going on. Then I would
22 call up the other employee and let them know that what
23 is happening is now considered unwelcome, and the other
24 person doesn't choose to engage in this type of behavior
25 at work. And then that employee would have to go

99

1 through retraining on what sexual harassment is.
2 Regardless, technically it's not sexual
3 harassment because, you know, nothing has been reported
4 at this point. She hasn't told the other person to
5 stop. There hasn't been maybe touching involved, right?
6 If touching has been involved, now you've escalated it
7 up to sexual harassment. The type of language could
8 determine if it's sexual harassment or not.
9 You mentioned a phone number. Asking for a
10 phone number is not necessarily sexual harassment. If
11 she had told him quite a few times, Hey, look, stop, and
12 then it continues, yes, then it's harassment. There are
13 a lot of different variables to it. But regardless the
14 employee is going to go through retraining. They are
15 going to be retrained on the sexual harassment policy,
16 and then let them know they need to stay away from that
17 other employee. And if there are any other issues, we
18 will need to have another conversation.
19 Q Let me just ask you one more thing. During
20 your time at JBS, do you recall any time when you had to
21 investigate any of your trainers, whether floor trainers
22 or classroom trainers, any of them on sexual harassment
23 claims?
24 MS. VICKLES: Object to form.
25 Q (By Mr. Okunade) Did you understand the

111

# C E R T I F I C A T E

STATE OF COLORADO    )
                     )  ss.
COUNTY OF DOUGLAS    )

    I, Nathan Stormo, Registered Professional Reporter and Notary Public in and for the State of Colorado, duly appointed to take the deposition of BRANDON SELLERS, certify that prior to the examination the deponent was duly sworn to testify to the truth in the matters in controversy between the parties herein; that the deposition was taken in shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form by me and processed under my supervision, the same consisting of 110 pages, and that the same is a full, true and complete transcription of my shorthand notes. I further certify that I am not related to, employed by, nor counsel to any of the parties herein, nor otherwise interested in the events of the within cause.

    A transcript review of this deposition was requested and is available to the deponent as notified by me.

    IN WITNESS WHEREOF, I have affixed my notarial seal this 27th day of August, 2016. My commission expires November 20, 2017.

_____
Nathan Stormo
Registered Professional Reporter