# EXHIBIT 6

*Weli A. Farah vs.*

*JBS USA, LLC*

---

*Deposition of Kacem Andalib*

*August 01, 2016*

---



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Page 5

1               P R O C E E D I N G S
2               KACEM ANDALIB,
3   having been first duly sworn, was examined and testified
4   as follows:
5          THE DEPONENT:  I affirm.
6               EXAMINATION
7   BY MR. OKUNADE:
8          Q.  Good morning, Mr. Andalib.  My name, as we
9   met, is Tayo Okunade, and I represent Weli Farah in the
10  employment dispute that he has against JBS.
11         A.  Good morning.
12         Q.  All right.  Good morning.  And I'll be
13  asking you a series of questions about the employment
14  dispute.  Now, if I refer to Weli Farah as Weli, you
15  would understand who I'm talking about?
16         A.  Yes, sir.
17         Q.  Okay.  Have you ever had your deposition
18  taken before?
19         A.  No.
20         Q.  Okay.  Let me just go over some ground
21  rules.  Essentially, I'll be asking you some questions.
22  As the court reporter sitting to your right has sworn
23  you, you're under oath.  I want to make sure that you
24  understand the questions that I'm asking you.  If you
25  don't, ask me to clarify and I'll do my best to clarify

Page 6

1   for you.  Also, in order to get clarity of record, let's
2   go ahead and give verbal responses.
3          A.  Perfect.
4          Q.  Yes and no, or however you want to answer,
5   as opposed to mm-hmm, uh-huh.
6          A.  Yes.
7          Q.  Okay?
8          A.  Yes, sir.
9          Q.  And the other thing too is when I'm asking
10  questions, just let me finish, and I'll let you finish
11  your responses before we each chime in.  Okay?
12         A.  Okay.
13         Q.  All right.  That way, it's easier for the
14  court reporter to take down everything that's being said.
15         A.  Perfect.
16         Q.  Is there any reason that would prevent you
17  from testifying clearly, thinking clearly, today?
18         A.  No.
19         Q.  Okay.  Are you taking any medications?
20         A.  No.
21         Q.  Okay.  And in the course of the day, if you
22  need any breaks, certainly ask me and I'll accommodate
23  the breaks as needed.
24         A.  Okay.
25         Q.  It's important, though, that if there's a

Page 7

1   question pending, we finish the question and you respond
2   to it before we go on break.
3          A.  Okay.
4          Q.  All right?
5              Prior to today's deposition, did you review
6   any written materials that either your attorney provided
7   you or you looked at on your own?
8          A.  Would you please repeat the question?
9          Q.  Sure.  Did you review any written materials
10  prior to your deposition today?
11         A.  I've -- I've went over a few notes that I
12  had before.
13         Q.  Okay.  And were those notes that you
14  created while at JBS or the notes that you created
15  after -- well, let me scratch that.
16              Were they notes you created before this
17  litigation began?
18         A.  Correct.  Yes.
19         Q.  Okay.  So they are not new notes?
20         A.  No, sir.
21         Q.  Okay.  And these are notes -- did you
22  provide the notes to your attorney?
23         A.  Yes.  They were the same notes that were
24  provided.
25         Q.  Okay.  Do you remember what the notes were

Page 8

1   called?
2          A.  I believe it was just the investigation in
3   itself.
4          Q.  Okay.  All right.  Other than that,
5   anything else?
6          A.  No, sir.
7          Q.  Okay.  And then other than, obviously, your
8   communication with your attorney, did you talk to anybody
9   else regarding your deposition today?
10         A.  No.
11         Q.  Okay.  Are you currently employed at JBS?
12         A.  Yes.
13         Q.  What's your title at JBS?
14         A.  I'm the human resource supervisor on the B
15  shift.
16              THE REPORTER:  On the B shift?
17              THE DEPONENT:  Second shift.  Yes, ma'am.
18         Q.  (By Mr. Okunade) Okay.  And B shift, from
19  what I recall last time, usually your hours would be from
20  about 2:30 or 3:00 on till about 11:00 or so?
21         A.  Pretty much, yes.
22              THE REPORTER:  Could you please speak a
23  little louder?
24              THE DEPONENT:  Sure.
25         Q.  (By Mr. Okunade) And when did you start

Page 9

1  working for JBS?
2      A.  October 13th of 2014.  October 13, 2014.
3      Q.  October 13, 2014?
4      A.  Yes.
5      Q.  And did you start as an HR supervisor at
6  that time?
7      A.  No.
8      Q.  What was your role?
9      A.  I was a operations supervisor.
10      Q.  And what did that entail, generally?
11      A.  Managing operations, ensuring yields are
12  met, and managing employees.
13      Q.  Okay.  And was that a role in the HR
14  division?
15      A.  No.  It was in operations.
16      Q.  Operations.  And when did you then move on
17  to HR?
18      A.  January 2015.
19      Q.  Did you go directly from an operations
20  supervisor to HR?
21      A.  Yes.
22      Q.  What was your role when you moved on to the
23  HR position in January 2015?
24      A.  HR supervisor.
25      Q.  Okay.  So since January 2015, you've been

Page 10

1  the HR supervisor on B shift?
2      A.  Correct.
3      Q.  Okay.  Do you have any management degree?
4      A.  A bachelor's degree in agricultural
5  economics or agribusiness, with a concentration in world
6  food distribution.
7      Q.  Where did you get that from?
8      A.  Prairie View A&M in Prairie View, Texas.
9      Q.  Okay.  So you're from Texas?
10      A.  Yes, sir.
11      Q.  When did you move to Colorado?
12      A.  A few months before October of 2014.
13      Q.  When you started with JBS?
14      A.  Right.
15      Q.  Had you worked with JBS prior to coming to
16  Colorado?
17      A.  No.
18      Q.  Okay.  And so do you have any -- do you
19  hold any degree or certificate in human resources?
20      A.  No.
21      Q.  Okay.  Just the one you told me?
22      A.  Yes.
23      Q.  What year did you graduate?
24      A.  2013.
25      Q.  Okay.  Were you born in the U.S.?

Page 11

1      A.  No.
2      Q.  Where were you born?
3      A.  Morocco.
4      Q.  Okay.  Which part of Morocco?
5      A.  Marrakesh.
6      Q.  Marrakesh?  When did you move to the U.S.?
7      A.  Around 2000.
8      Q.  And did you move to the U.S. to go to
9  school?
10      A.  Pretty much, yeah.
11      Q.  Okay.  Did you go to school in 2000?
12      A.  I sure did.
13      Q.  Where did you go?
14      A.  U of H.
15      Q.  I'm sorry?
16      A.  University of Houston, downtown.
17      Q.  Did you get a degree from U of H?
18      A.  I did not.
19      Q.  Okay.  And how long were you at U of H?
20      A.  If I remember right, about a year and some.
21      Q.  Okay.  So 2000 to 2001?
22      A.  Somewhere around there, yes.
23      Q.  Then after that, what did you do?
24      A.  After that, I went to Houston Community
25  College.

Page 12

1      Q.  Did you get a degree from there?
2      A.  Later on, I got an associate degree before
3  I went to Prairie View, and then finished up.
4      Q.  An associate in agriculture?
5      A.  Yeah, pretty much.  Science associate's.
6  They didn't really have an agriculture associate degree,
7  but it was more science oriented.
8      Q.  Oh, good.  And what about -- are you
9  married currently?
10      A.  I'm not.
11      Q.  Okay.  Do you have any kids?
12      A.  No.
13      Q.  Okay.  Now, as the HR supervisor, let me
14  focus on that.  You said you started that in January of
15  2015?
16      A.  Yes.
17      Q.  Did you apply for the position?
18      A.  I did not.
19      Q.  Okay.  How did you get the position?
20      A.  I was offered the position.
21      Q.  By whom?
22      A.  At the time, it was the HR director and
23  operations manager.
24      Q.  And what's his name?
25      A.  Chris Kitch and Max Xasan.

Page 13

1    Q.  Sorry?
2    A.  Max Xasan.  X-a --
3    Q.  Max Xasan?
4    A.  Xasan, yeah.  Starts with an X.
5    Q.  Mr. Max?
6    A.  Mr. Max I guess you want to call it.
7    Q.  So he offered you the position?
8    A.  Correct.
9    Q.  And you said a Chris?
10   A.  Chris Kitch was the operations manager at
11   the time.
12   Q.  How do you spell his name?
13   A.  Kitch, K-i-t-c-h.
14   Q.  And he was the operations manager?
15   A.  Manager at the time.
16   Q.  So he supervised you as operations
17   supervisor?
18   A.  Right.  He was ultimately the manager in
19   the plant of all operations on the fab side.
20   Q.  So how did the offering of the position go?
21   Do you understand my question?
22   A.  No.  If you would please be more specific.
23   Q.  Sure.  So was there a position that was
24   listed for the HR supervisor, or was that created for
25   you?

Page 14

1    A.  Oh, no.  It was an open position at the
2    time.
3    Q.  Okay.  So it was posted?
4    A.  Yes.
5    Q.  All right.  And you saw the posting?
6    A.  I don't recall --
7    Q.  Okay.
8    A.  -- if I saw the posting.
9    Q.  Did you talk to either Max Xasan or Chris
10   Kitch about the position?
11   A.  Down -- what do you mean?  Like --
12   Q.  Originally.  So did you bring it up to them
13   and say, for example, Hey, Mr. Xasan, I see a position
14   open; can I apply for it?
15   A.  No.  That's not the way it went.
16   Q.  Okay.
17   A.  I was approached and asked if I would be
18   interested in it.
19   Q.  Do you know why he approached you?
20   A.  I would assume people skills.
21   Q.  Do you know who specifically approached
22   you, either Max or Kitch?
23   A.  Max.  Max approached me.
24   Q.  And so you went ahead and applied for the
25   position, I would assume, right?

Page 15

1    A.  (Nodded head.)
2    Q.  Did you submit an internal application for
3    the position?
4    A.  I submitted a resume.
5    Q.  Just a resume?
6    A.  Yes, sir.
7    Q.  And did you submit that to Max?
8    A.  Yes.
9    Q.  Did you submit anything to HR, other than
10   Max?
11   A.  Max.  Just to Max.
12   Q.  And did you then go ahead and interview for
13   the position?
14   A.  What do you mean by interview?  As in a
15   panel interview?
16   Q.  No.  I'm just asking if anybody interviewed
17   you based on the resume you submitted for the position.
18   A.  Max would be the person who interviewed me.
19   Q.  Okay.  So Max interviewed you as well.  Did
20   you have an interview with Chris Kitch?
21   A.  No, I did not.
22   Q.  Okay.  How did the interview with Max go?
23   A.  Well.
24   Q.  If you recall, what exactly -- I mean, did
25   he ask you what your background was?  What went on?

Page 16

1    A.  He asked me about my education.
2    Q.  Okay.  What else?
3    A.  And my experience.
4    Q.  Okay.  And what did you tell him about your
5    experience?
6    A.  Told him that I previously worked for
7    Cargill, and I also had my own company back in Texas; and
8    I was pretty much used to managing folks, and spoke to
9    him about my experience.
10   Q.  Okay.  Let's talk a little bit about that.
11   So Cargill, when did you work for Cargill?
12   A.  June 2013, I believe.
13   Q.  June 2013?
14   A.  Correct.
15   Q.  All the way to October 2013?
16   A.  Pretty much, until the end of 2014.
17   Q.  I'm sorry.  I don't want to put words in
18   your mouth.  So June 2013 through when?
19   A.  Until a few months before October 2014.
20   Q.  Okay.  And what was your role at the time
21   you left Cargill?
22   A.  I was the operations supervisor.
23   Q.  Were you in HR?
24   A.  No.  They spent a lot of time in HR,
25   though, for translation purposes and assistance and

Page 21

1    Q.   Okay.  So you were going to be working

2  under Max, essentially?

3    A.   Under Max.

4    Q.   Did you know Max prior to coming to the JBS

5  Greeley plant?

6    A.   No.

7    Q.   Did you interview with anybody for your

8  operations supervisor position?

9    A.   Sure.

10   Q.   Do you remember who that was?

11   A.   Chris Kitch, and I believe it was Arnulfo

12  Garcia.  Arnulfo.

13   Q.   Arnulfo?

14   A.   Arnulfo Garcia.

15   Q.   And did a JBS employee recommend you for

16  that position?

17   A.   Which position?

18   Q.   The operations supervisor position.

19   A.   No, not -- not that I'm aware of, no.  I

20  didn't know anybody at JBS.

21   Q.   Okay.

22   A.   Yeah.

23   Q.   And you said Max was your immediate

24  supervisor.  Did you have an understanding, when you

25  started in January 2015 as an HR supervisor, what your

Page 22

1  reporting duties to Max was?

2    A.   Reporting duty as in how often or what to

3  report or --

4    Q.   Let's start with what to report.  Did you

5  have an understanding of what you were to report to Max?

6    A.   Right.  Yeah.  My understanding was that

7  I -- pretty much anything that relates to HR.  Anything

8  that I handle, I should be reporting to him.

9    Q.   Okay.  And then in terms of how often you

10  reported, how did that go?

11   A.   As often as possible.  Could be on a weekly

12  basis, sometimes on a daily basis, I may type a recap and

13  send it.

14   Q.   Sorry.  I'm trying to follow.  So the last

15  thing you said on the recap basis?

16   A.   No.  I'll type in a recap for everything

17  that I would do and -- you know, and send it, email it to

18  Max, for example, or just directly report to him if I

19  have any issues.

20   Q.   Okay.  So you communicate with Max via

21  email?

22   A.   Or directly.

23   Q.   Yes or no.  Via email?

24   A.   Yes.

25   Q.   Okay.  Via phone?

Page 23

1    A.   Via phone, if I don't get a response to an

2  email, sure, I may pick up the phone and call his

3  extension, if I need anything.

4    Q.   Okay.  And then you would see him on a

5  daily basis, you'd drop in his office, that kind of

6  thing?

7    A.   Yes.

8    Q.   Okay.  Because there was an open-door

9  policy, if you will?

10   A.   Exactly.

11   Q.   Okay.  And as HR supervisor, did you have

12  any employees at JBS that reported to you?

13   A.   No.

14   Q.   All right.  So let's delve a little bit

15  more about your work as the HR supervisor, and you said

16  specifically for the B shift.

17   A.   Correct.

18   Q.   Who was the HR supervisor for the A shift

19  while Weli was there?

20   A.   What period of time are we talking about?

21   Q.   Okay.  Let's limit it to January 2015.

22   A.   Okay.  That would be Virginia Ramirez.

23   Q.   Is she still at the company, do you know?

24   A.   Yes.

25   Q.   Okay.  And as an HR supervisor, can you

Page 24

1  tell me a little bit more about your job duties on a

2  day-to-day basis?

3    A.   My job duties on a day-to-day basis were

4  pretty much focused on labor relations and the union

5  pretty much.  Interacting with employee relations and

6  initiating or dealing with anything that would come from

7  the union, mainly, as well.  So mainly, employee

8  relations.

9    Q.   So you dealt a lot with the operations

10  people, the employees there in production, those kinds of

11  people?

12   A.   Yes.

13   Q.   Did you deal with nonunion employees as

14  well?

15   A.   Correct.

16   Q.   Okay.  And did you have an office that you

17  worked out of?

18   A.   Yes.

19   Q.   Okay.  Where was your office located?  On

20  which floor was it located at the JBS Greeley plant?

21   A.   Not at the very bottom floor, but at the

22  first floor.

23   Q.   And from what I understand, there were

24  three floors?

25   A.   Right.  So you got the very first bottom

Weli A. Farah vs.
JBS USA, LLC

Deposition of Kacem Andalib
August 01, 2016

Page 33

1  trainers," "team lead," that's used at JBS Greeley plant?
2    A.  Team lead.
3    Q.  Okay.
4    A.  Yes.
5    Q.  What's your understanding of what that
6  means?
7    A.  The team lead would be the person most
8  qualified to lead a group of workers.
9    Q.  Okay.
10    A.  So depending on what department they are.
11    Q.  So there would be team leads for
12  operations?
13    A.  Absolutely.
14    Q.  Would there be team leads for training?
15    A.  Yes.  I believe so, yes.
16    Q.  You believe so?
17    A.  Yes.
18    Q.  Okay.  And then that's -- that team lead is
19  separate terminology for lead trainers?
20    A.  Pretty much means the same thing.
21    Q.  Okay.  Was Weli considered a team lead, as
22  you know it?
23    A.  Team lead, correct.
24    Q.  He was?  Sorry.  Let me make sure I get
25  your answer.  Was considered team lead while he was a

Page 34

1  classroom trainer?
2    A.  That's my understanding, yes.
3    Q.  Okay.  And did you ever witness Weli during
4  the time that you saw him before he was terminated, did
5  you witness him provide direction or instructions to
6  floor trainers?
7    A.  Directly witness him --
8    Q.  Yes.
9    A.  -- giving instructions?  I can't recall at
10  this time.
11    Q.  Okay.  And do you recall whether anybody
12  told you that they witnessed him giving instructions to
13  floor trainers?
14    A.  If you would rephrase your question,
15  please, sir.
16    Q.  I'm asking if anybody came up to you while
17  Weli was working there and while he was a team lead, as
18  you indicated, do you recall anybody at JBS coming to you
19  and saying, Weli's giving floor trainers instructions?
20    MS. VICKLES:  Object to form.  Are you
21  asking about team lead of classroom instructors or team
22  lead of floor trainers?
23    MR. OKUNADE:  Okay.  Fair enough.  Let me
24  rephrase.
25    Q.  (By Mr. Okunade) So you just testified,

Page 35

1    Mr. Andalib, that Weli -- at least in your opinion, Weli
2  was considered a team lead?
3    A.  Correct.
4    Q.  Okay.  So let me ask you to clarify.  The
5  team lead of what was Weli?
6    A.  Trainer lead.  Was pretty much responsible
7  for training on the B shift when a manager was not there.
8  That's why I saw him as a trainer -- as a lead.
9    Q.  As a lead.  So, I mean, is he leading the
10  other classroom trainers, or is he leading all the
11  trainers that were on B shift, is what I'm trying to
12  understand.
13    A.  Okay.  I'm trying to see how I -- I
14  would -- I would say a lead trainer, as in the other
15  trainers would go up to him.
16    Q.  So both the classroom trainers and the
17  floor production trainers as well would go up to him?
18    A.  Correct.
19    Q.  And they look up to him as a team lead?
20    A.  Would address him.
21    Q.  Okay.
22    (Exhibit 36 was marked.)
23    MR. OKUNADE:  Heather, so I only have one
24  copy of this.
25    Q.  (By Mr. Okunade) This is the defendant's --

Page 36

1  I'm handing you what's marked as Exhibit 36, first of
2  all.  It's Defendant's Second Supplemental Responses to
3  Plaintiff's First Set of Written Discovery to Defendant,
4  and then in parentheses, With Correction to Response to
5  Interrogatory No. 6.  Let me have you turn on that
6  exhibit to page 2 on the bottom center.  And there's a
7  question there -- well, let me ask you first of all, have
8  you seen this document before I just handed it to you?
9    A.  I don't think I saw this document before.
10    Q.  Okay.  On page 2 it says:  Identify all
11  persons who participated in preparing the answers and,
12  slash, or responses, comma, in whole or in part, comma,
13  to any of plaintiff's first set of written discovery to
14  defendant.  Did I read that correctly?
15    A.  (Nodded head.)
16    Q.  Is that a yes?
17    A.  Yes.
18    Q.  Okay.  And the response, it says, Yulibeth
19  Rocha -- Rocha -- sorry -- R-o-c-h-a, and Kacem Andalib.
20    A.  Kacem (pronouncing).
21    Q.  Kacem.
22    A.  Yes, sir.
23    Q.  That's you?
24    A.  That's me.
25    Q.  Okay.  So did you help prepare the answers

Page 49

1   Q. (By Mr. Okunade) Okay. Would you say he was
2   a good worker?
3       MS. VICKLES: Object to form.
4       A. I mean, I was never in a position to judge
5   his performance as far as work goes.
6       Q. (By Mr. Okunade) Okay.
7       A. But I have no reason to say he was a bad
8   worker.
9       Q. Did anybody come to complain to you that he
10  wasn't doing his job?
11      A. No.
12      Q. Let me refer you to Exhibit 15 that's
13  already in your exhibit packet there. Have you seen this
14  document before today?
15      A. Yes.
16      Q. Okay. Is this your handwriting on the
17  document?
18      A. Yes.
19      Q. Okay. And this is the personnel action
20  record that indicated that Weli was being placed on
21  indefinite suspension, correct?
22      A. Correct.
23      Q. Okay. And do you recall when you typed
24  this or when you wrote this out?
25      A. March 11th.

Page 50

1       Q. That was on the date that it's dated?
2       A. Correct.
3       Q. Okay. And we'll talk about that in just a
4   minute. I just wanted to talk specifically about this
5   document. Is that your signature there that's personnel
6   department signature?
7       A. Yes.
8       Q. Okay. And it has a date, it says on the
9   bottom or the middle of that line where there's lines,
10  15:55. What was that time referring to?
11      A. Five minutes until 4:00.
12      Q. Okay. And is that when you would have
13  written this out?
14      A. I believe so.
15      Q. Okay. So just to clarify -- I get confused
16  about military time sometimes. So this is 3:55, correct?
17      A. Yes.
18      Q. Okay. All right. And then just bouncing
19  back and forth for just a minute. Let me have you turn
20  to Exhibit 28 in that same packet. This is a time detail
21  for Weli Farah, and it has the dates on the top left-hand
22  corner on that first page there. Do you see it?
23      A. On the first page?
24      Q. On the first page. On the top left-hand
25  corner, there is a time period and range of dates.

Page 51

1       A. Okay.
2       Q. And it says dates 12/31/12, hyphen,
3   3/18/2016. Do you see that?
4       A. I see it.
5       Q. Okay. And that's pertaining to Weli Farah,
6   correct?
7       A. Yes.
8       Q. All right. Let me have you turn on that
9   to -- on the bottom right-hand corner, there are JBS
10  numbers, and I'm looking at JBS 00325.
11      A. Okay.
12      Q. Do you see that?
13      A. Mm-hmm.
14      Q. Now, just looking, it says -- and I'll
15  start from where it says Sunday -- or Monday 2/16 on the
16  left-hand corner there. It's about -- one, two, three,
17  four, five, six -- seven lines from the top.
18      A. Okay.
19      Q. Okay. Now, before I ask you a question on
20  this, is this a document that you are familiar with?
21      A. I know what this document is.
22      Q. I'm sorry. You know what the document is?
23  And is it just --
24      A. I mean like I know what the form is.
25  That's what I mean. It's Kronos.

Page 52

1       Q. And it would be a detail of the clocking
2   in, clocking out for an employee?
3       A. Correct.
4       Q. Okay. So between 2/16, Monday 2/16, and
5   just take a moment to look at that. Monday, 2/16, all
6   the way through Wednesday, 3/11, would you agree with me
7   that between that time frame, that Weli was mostly
8   working in the morning? You can take a minute to look at
9   that.
10      A. Yes.
11      Q. Okay. And then on 3/11, it looks like he
12  came in 8:37 a.m., took a lunch at 12:58, came back at
13  1:29, and then he clocked out at three o'clock. Is that
14  a correct representation of the time that is on that
15  page?
16      A. Yes.
17      Q. Okay. So he was clocked out by three
18  o'clock p.m.?
19      A. That's what the paper says.
20      Q. Okay. All right. Now let's go back to
21  Exhibit 15. On there it says that Weli is being placed
22  on suspension pending the results of investigation. Do
23  you see that?
24      A. I do.
25      Q. And you wrote that?

Weli A. Farah vs.
JBS USA, LLC

Deposition of Kacem Andalib
August 01, 2016

Page 61

1  what was the process that you wanted to go through with
2  the interview?  Do you understand the question?
3        A.  The process as in?
4        Q.  As in did you create some sort of a road
5  map of who you interview first, how you interviewed that?
6  How did you go about doing that?
7        A.  By availability.
8        Q.  Okay.  So you had the list of everybody in
9  B shift.  Now, everybody, I'm talking about floor
10  trainers and classroom trainers; is that correct?
11        A.  The trainers that are mostly upstairs.
12  Because some trainers spend more time upstairs as -- in
13  the class than they do on the floor.
14        Q.  Are those -- now, again, just for clarity,
15  are you referring to both classroom trainers and floor
16  trainers?
17        A.  Yes.
18        Q.  Okay.  So it's fair to say Khin Ou, as a
19  floor trainer, would -- in your statement, spent more
20  time upstairs?
21        A.  Yes.
22        Q.  Okay.  And when you say spend more time
23  upstairs, what are you talking about?  What would they be
24  doing upstairs?
25        A.  Bringing employees back and forth, things

Page 62

1  like that.
2        Q.  For what?
3        A.  Back from the floor into classroom
4  training.
5        Q.  And were these the employees that the --
6  for example, the floor trainers, were they the employees
7  that they were responsible for, or were they just
8  different employees?
9        A.  The employees that they would be
10  responsible for.
11        Q.  Okay.  And I guess I'm using the term
12  "responsible for" loosely, but what's your understanding
13  of that?
14        A.  As in the ones in their departments.
15        Q.  Okay.  So essentially, they would bring
16  them up for some sort of a training, and then escort them
17  down or send them down?  I mean, how did that work?
18        A.  Preferably escort them.
19        Q.  Okay.  And so when you're -- going back to
20  your statement, you said they spent more time upstairs.
21  Are they up with them when they're training, with the
22  employees when they're training?  Is that what you're
23  saying?
24        A.  In some trainings.
25        Q.  Okay.  When there's no training going on,

Page 63

1  would these floor trainers also be upstairs?
2        A.  If they're floor trainers, they should be
3  downstairs.
4        Q.  Right.  I understand they should be
5  downstairs.  But you just made a statement saying that
6  the floor trainers -- you started by interviewing the
7  trainers that were mostly upstairs.
8        MS. VICKLES:  Object to form.
9        A.  By mostly upstairs, meaning that I've --
10  that I would see more often maybe, if you would.
11        Q.  (By Mr. Okunade) Okay.  And I don't want to
12  put words in your mouth.  I mean, I think your statement
13  was you started with trainers that spend more time
14  upstairs.  That's what you said.  And I'm just trying to
15  clarify that.  Okay?  So you're saying that these are
16  trainers that would stay up after training of their
17  employees went downstairs?
18        MS. VICKLES:  Object to form.
19        A.  Not that they would stay up.  I had -- I
20  would see them more often than floor trainers that would
21  be more often on the line.  So some trainers, for
22  example, if we're talking about chuck boners, would
23  literally be on the line teaching each employee.  Others
24  who would have reasons to be back and forth would be the
25  ones that I would see more often.

Page 64

1        Q.  Okay.  And so let me talk specifically Khin
2  Ou.  Why would she be more upstairs?  Why would she spend
3  more time upstairs?
4        A.  Khin Ou, if I were to give you an answer, I
5  would say because she's -- she speaks Burmese.  So she
6  speaks the language and -- that is needed upstairs.
7        Q.  Okay.  So she would help with people that
8  need translation with Burmese?
9        A.  For all their needs.
10        Q.  Okay.  Would this apply whether those were
11  the employees she was responsible for and employees she
12  wasn't responsible for?
13        A.  I would think so.
14        Q.  Okay.  Okay.  And then the same with Alicia
15  Serrano.  In your opinion, she would spend more time
16  upstairs.  Do you know why she would spend more time
17  upstairs?
18        A.  No.
19        Q.  Okay.  I mean, was she one that would spend
20  more time upstairs?  I guess that's my question.
21        A.  Not -- not really sure.
22        Q.  You're not sure if she spent more time --
23        A.  If she spent more time.
24        Q.  -- upstairs?
25        A.  Well, on B shift, yes, I would say she did.

Page 65

1    Q.  Okay.  And did she speak a language that
2  would -- scrap that.
3         Did she help with translation as well
4  upstairs?
5    A.  She spoke Spanish.  She speaks Spanish.
6    Q.  And is that a reason that she would be
7  upstairs, to help translate or help people interpret into
8  Spanish?
9    A.  Could definitely be a reason.
10    Q.  And then going back to Marietta Lopez,
11  would you say that she spent more time upstairs as well
12  than on the production floor?
13    A.  I wouldn't know.
14    Q.  You wouldn't know.  Now, these two, the
15  Alicia Serrano and Khin Ou, did they also have an office
16  upstairs or desk?
17    A.  Not that I know of.
18    Q.  Okay.  So when they were upstairs, were
19  they just --
20    A.  In the classroom.
21    Q.  Okay.  And I believe you already mentioned
22  or referred to Abdelilah Karim, and his name shows up on
23  page 6.  Is that the same Abdelilah you were just talking
24  about that originates from Morocco?
25    A.  Yes.

Page 66

1    Q.  Okay.  What was the reason that you
2  interviewed him?
3    A.  To confirm one of the statements.
4    Q.  I'm sorry.  To confirm what statements?
5    A.  One of the employee statements.  One of the
6  witnesses' statements, I think.
7    Q.  Do you know which witness?
8    A.  Either Efrah Abdella or Anab Ali.  A-n-a-b,
9  A-l-i.
10    Q.  And do you know exactly what you wanted to
11  confirm?
12    A.  I -- in one of the statements -- can I look
13  at the statement real quick or --
14    Q.  I'll get there.  I'll get there.
15    A.  So I can't really remember exactly right
16  now, yeah.
17    Q.  That's fine.  And you can tell me you can't
18  remember.
19    A.  Very good.
20    Q.  I'll get there.  I'm going off of what
21  you're telling me right now.
22    A.  Yes.
23    Q.  Okay.  So you can't remember?
24    A.  I can't remember exactly what it was for,
25  but it was something -- she told me, You can ask Karim,

Page 67

1  you can ask Karim, something about...
2    Q.  Okay.  Was Karim, was he a supervisor for
3  either Anab or Efrah?
4    A.  I believe so.
5    Q.  Okay.  Do you know which one?
6    A.  Which one?
7    Q.  Whether it was Anab or Efrah.
8    A.  I don't know for sure.
9    Q.  And at the time you were doing this these
10  interviews, again going back to March 10th, you started
11  March 10th from the responses here and from your
12  statements, and they went through, in here, under page 6,
13  March 13th, at least in what's written in this exhibit,
14  was there a reason that you didn't interview Khin Aye?
15    A.  I guess I just -- I didn't see him often.
16  I didn't know -- he's on day shift, that I barely saw
17  him.
18    Q.  So you're saying that you basically
19  interviewed these individuals primarily because those are
20  the people that you saw more often than the others?
21    A.  No.  That's not what I said.
22    Q.  Okay.  But the reason you didn't interview
23  Khin Aye was because you didn't see him?
24    A.  His name never came up.  I -- I mean didn't
25  come up, and I didn't -- I wasn't familiar, or maybe he

Page 68

1  would leave before me.  Maybe I didn't know -- I wasn't
2  sure -- I'm not sure exactly.  But I -- I don't remember
3  seeing Khin Aye or run into him often or anything like
4  that.
5    Q.  But do you remember that during the time
6  you were doing this interview, he was a classroom
7  instructor?
8    A.  Right.
9    Q.  Okay.  All right.
10         Let me have you turn on your exhibit
11  notebook there to Exhibit 32.  I believe these were the
12  statements that you were referring to.  On Exhibit 32,
13  it's just -- I don't know how many pages, but there's a
14  bunch of pages there on the lower right-hand corner,
15  there are JBS numbers.  You see that?
16    A.  Yes.
17    Q.  Okay.  And I may have mine in different
18  order than yours, so I'm just going to refer to the JBS
19  numbers just for a better reference for you.
20    A.  Okay.
21    Q.  Okay?  Let me start with JBS 000043.  Tell
22  me when you're there, please.
23    A.  Okay.
24    Q.  I'd like to go through these statements in
25  a little bit more detail, one by one, and ask you some

Page 69

1  questions about them.  Okay?
2      A.  Okay.
3      Q.  All right.  Now, this is a statement that
4  was taken by you, correct?
5      A.  Correct.
6      Q.  And it was a statement from Marietta
7  Herrera Lopez.  In fact, it says that on the top
8  right-hand corner?
9      A.  Correct.
10      Q.  And there's a date on there too.  It says
11  3/10/2015.
12      A.  Correct.
13      Q.  Okay.  Is this your handwriting?
14      A.  Yes.
15      Q.  Okay.  And do you recall -- and you said
16  you didn't recall what time you talked to Marietta?
17      A.  Not exactly.
18      Q.  Okay.  Was there a reason that you spoke
19  with Marietta other than the fact that Yulibeth Rocha had
20  mentioned that, during her communication with you on
21  March 10th, had mentioned her name?
22      A.  No.
23      Q.  Okay.  There was no independent reason you
24  spoke to her?
25      A.  No.

Page 70

1      Q.  Okay.  Now, tell me just generally, when
2  you were taking down the notes for this interview, you
3  called Marietta up to your room, to your office?
4      A.  Correct.
5      Q.  Okay.  And then you started asking her
6  questions?
7      A.  Yes.
8      Q.  Okay.  So how did the questioning start, if
9  you will, for Marietta?
10      A.  Tell me what happened.
11      Q.  Okay.  And did you provide her any context
12  as to what happened regarding what?
13      A.  In regarding to what she and Yuli spoke
14  about earlier or the day before as far as replacing or
15  being sent to replace somebody else.
16      Q.  Okay.  And then she says on the first --
17  second line there, it says, I came upstairs, parentheses,
18  training room, closed parentheses, for a coworker's
19  birthday.
20          Do you know which coworker she was
21  referring to there?
22      A.  I do not.
23      Q.  Okay.  Did you ask her which coworker it
24  was?
25      A.  I don't recall.

Page 71

1      Q.  And then she goes and says, I went down and
2  told Efrah -- I'm reading about five lines down there --
3  went down and told Efrah that I'm replacing her.  See
4  where I'm reading there?
5      A.  Yes.
6      Q.  And then it says, And for her to go
7  upstairs?
8      A.  Yes.
9      Q.  Okay.  And then -- let's see.  Do you know
10  who Efrah's supervisor was at the time that you were
11  doing this investigation?
12      A.  I believe it was Nick Trevino.  I believe
13  it was Nick Trevino.
14      Q.  How do you spell his last name?
15      A.  T-r-e-v-i-n-o.
16      Q.  Do you know if Nick still works for JBS?
17      A.  Yes.
18      Q.  Okay.  And did you speak with Nick to
19  interview him for your investigation?
20      A.  No.
21      Q.  Is there a reason why not?
22      A.  Supervisors move a lot in the fab floor, so
23  they can have one supervisor today and a different
24  supervisor the next day.  It's -- I mean, when I asked
25  about who the supervisor is, I may be given two or three

Page 72

1  different names.
2      Q.  But you're saying that Nick Trevino was
3  the --
4      A.  I believe it was Nick Trevino.
5      Q.  Okay.  And then on the bottom of that
6  first -- that JBS 00043, it says, quote, I never
7  questioned it because he is my team lead.  You see that?
8      A.  Yes.
9      Q.  And that would have been referring to Weli?
10      A.  Correct.
11      Q.  Okay.  And the statement before that, the
12  line before that statement I just read, there's a
13  statement that says, quote, This has been ongoing since
14  around -- it had August, and then there was a line
15  through August, and then it says November, slash, looks
16  like December.
17          Okay.  Now, these are your notes.  Were you
18  the one that crossed out August?
19      A.  It would be me.
20      Q.  Okay.  Do you remember why you crossed it
21  out?
22      A.  I do not.
23      Q.  Okay.  Now, from this document here, there
24  were -- and you can take a little minute to refresh your
25  memory, but I'll represent to you that the girls that are

Page 89

1  somebody, I always thought that means the same thing.
2  Q. Okay. Did you tell you whether she'd
3  reported any instances of Weli hitting on her, as you
4  say, or making advances --
5  A. No.
6  Q. -- to her? I'm sorry?
7  A. No.
8  Q. So she didn't tell you that she made
9  reports?
10  A. Before?
11  Q. Before.
12  A. To who?
13  Q. Anybody.
14  A. She did not tell me that she reported it
15  previously.
16  Q. Okay. Okay. So anybody else other than
17  the -- Ms. Lopez, Ms. Serrano, Mr. Acharya, and Ms. Ou,
18  anybody else that you recall that you interviewed or
19  spoke to on March 10th relating to the investigation
20  concerning Weli?
21  A. No.
22  Q. Okay. So on March 10th, based on those
23  interviews that you did with those four individuals, what
24  was your understanding of what Weli was doing?
25  A. At that time, I was investigating.

Page 90

1  Q. So you hadn't formed an opinion as to what
2  Weli was doing wrong or what he was being accused of
3  doing?
4  A. I was investigating at the time.
5  Q. I mean, you had not -- you didn't form an
6  opinion about that yet?
7  A. The investigation was not conclusive yet.
8  Q. Okay. I'll take that. And so you
9  continued on the investigation?
10  A. Yes.
11  Q. Okay. And then you spoke to Weli on
12  March 11th?
13  A. Correct.
14  Q. Okay. Let me have you turn to JBS 00041.
15  Prior to speaking with Weli on March 11th, do you
16  remember talking to anybody else?
17  A. Could you be specific in your question?
18  Q. Let me ask you a different way. Before you
19  spoke with Weli and took notes about your interview with
20  him, did you speak with anybody else relating to the
21  investigation?
22  A. Not that I recall.
23  Q. Okay. So you just -- Weli came in and you
24  called him up?
25  A. Give me one quick second to clarify

Page 91

1  something.
2  I may have spoken with Miguel.
3  Q. Miguel --
4  A. Muniz.
5  Q. -- Muniz? Okay. So you think you spoke
6  with Miguel before you spoke with Weli?
7  A. I think so.
8  Q. And Miguel gave you a statement?
9  A. 55. Notes.
10  Q. Okay. So that would be JBS 00055?
11  A. Correct.
12  Q. And this is also your handwriting?
13  A. Yes.
14  Q. Okay. And so again, if this -- you can
15  take a look at the statements to refresh your memory, but
16  I guess what I'm trying to find out is, speaking with
17  Miguel, was there anything that you learned in your
18  investigation that you can recall right now about Weli?
19  A. Yes.
20  Q. And that would be what?
21  A. It would be reiterating what the other
22  witnesses had said already.
23  Q. Which was?
24  A. Which was a misuse of company time and
25  resources.

Page 92

1  Q. That's what you concluded after you spoke
2  with Miguel?
3  A. After speaking with all the witnesses.
4  Q. Right. When we're talking all the
5  witnesses, we're talking Ms. Lopez, Ms. Serrano,
6  Mr. Acharya, and Ms. Ou?
7  A. Correct.
8  Q. And then Mr. Muniz?
9  A. Correct.
10  Q. Okay. So after that, you concluded that
11  Weli was misusing company time by that time?
12  A. By that time, yes. By that time.
13  Q. Okay. Then after Miguel is when you talked
14  to Weli?
15  A. I believe so, yes.
16  Q. Okay.
17  A. I believe so.
18  Q. And did you speak to -- did you interview
19  anybody else between Miguel and Weli, that you recall?
20  A. I'm not sure.
21  Q. Okay. Now let me have you turn to JBS
22  00040.
23  A. Okay.
24  Q. Do you know who typed this out?
25  A. I did.

Weli A. Farah vs.                                                          Deposition of Kacem Andalib
JBS USA, LLC                                                                        August 01, 2016

Page 93

1    Q.  You did?
2    A.  Yes.
3    Q.  Okay.  And do you know when you typed it
4    out?
5    A.  The 11th I would say.
6    Q.  Of March?  And specifically, was it after
7    you talked to Miguel Muniz?
8    A.  I'm pretty sure, yeah.  Pretty sure.
9    Q.  Okay.  So after you talked to Miguel Muniz,
10   you typed this out?
11   A.  No.  The question is not very specific.
12   Definitely after I spoke -- after Miguel Muniz, but not
13   necessarily right after I spoke to Muniz.
14   Q.  Okay.  Fair enough.  Did you type it before
15   you spoke to Weli?
16   A.  No.
17   Q.  Okay.  So you typed it sometime after
18   during the day on the 11th?
19   A.  I would assume that, yes.
20   Q.  Okay.  Now, before I go into that document,
21   I'm going to skip back again to JBS 00041.
22   A.  Mm-hmm.
23   Q.  And this is the interview that you had with
24   Weli.
25   A.  Okay.

Page 94

1    Q.  Okay.  This is your handwriting, correct?
2    A.  Yes.
3    Q.  Other than yourself, do you recall who was
4    present at this interview with Weli?
5    A.  I believe Yulibeth Rocha was present.
6    Q.  Okay.  Anybody else?
7    A.  I can't honestly recall at the moment.
8    Q.  Okay.  And then on there you said,
9    question -- this is your handwriting, right?
10   A.  Correct.
11   Q.  Quote, We received complaints that you
12   instruct trainers to replace an employee in packaging.
13   Is that you writing that --
14   A.  Yes.
15   Q.  -- statement?
16   A.  Yes, that's me writing.
17   Q.  Okay.  And was there a reason that you put
18   that question there at the top of the notes that you
19   took?
20   A.  The only reason, maybe me indicating that
21   that's the question I'm asking.
22   Q.  Okay.  But you didn't have a question about
23   any issues concerning harassment, correct?
24   A.  On these notes?
25   Q.  Yes.

Page 95

1    A.  Not that I can see.
2    Q.  Okay.  So the only question that you were
3    wanting to be answered by Weli was regarding that
4    question you indicated on your notes on JBS 00041?
5    MS. VICKLES:  Object to form.
6    A.  I had a few different questions for him
7    here.
8    Q.  (By Mr. Okunade) Okay.  Was there a reason
9    that you didn't indicate those questions on your notes?
10   A.  As the interview was ongoing, I was taking
11   notes of the answers.
12   Q.  Okay.  Did you also ask Weli to have a
13   separate statement written to you?
14   A.  I can't recall at the moment.  I honestly
15   can't.
16   Q.  But there was none that was submitted
17   during the interview process?
18   A.  Not that I recall.
19   Q.  Okay.  Now, the only employee named by name
20   in your statement, and I'm just looking at this JBS
21   00041, was Efrah Abdi?
22   A.  Who?
23   Q.  Efrah -- looking at -- one, two, three,
24   four -- the fourth line there.
25   A.  Okay.

Page 96

1    Q.  Did you talk about any other employees
2    specifically by name other than Efrah?
3    A.  I'm not sure I understand the question.
4    Q.  Okay.  I'm looking at this document that
5    you wrote.
6    A.  Okay.
7    Q.  Okay?  And you're asking Weli questions,
8    correct?
9    A.  Yes.
10   Q.  Correct?
11   A.  Correct.
12   Q.  The only name that I see that's on the
13   notes that you took was Efrah Abdi.
14   A.  Okay.
15   Q.  Right?  I'm asking whether there was any
16   other employee that came up by name during the interview
17   that you had with Weli.
18   A.  Not that I remember.
19   Q.  Okay.  Did you ask her about the other girl
20   that has been mentioned in the other statements that we
21   looked at on March 10?
22   A.  Who is "her"?
23   Q.  I'm just asking if you clarified that with
24   him.
25   A.  Oh, with him, not her.  Okay.  I don't

Page 97

1  recall at the moment.
2      Q.  Okay.  And you didn't ask her about Khin
3  Ou's statement, correct?  Or you didn't ask Weli about
4  Khin Ou's statement?
5      A.  I don't recall at the moment.
6      Q.  Okay.  And you would agree that the
7  majority of the notes that you took on 3/11 during the
8  interview of Weli related to Efrah, correct?
9      A.  Yes.
10      Q.  Okay.  And at the time you spoke with Weli
11  on 3/11, you had not spoken with Efrah, correct?
12      A.  I don't recall exactly.
13      Q.  Okay.  So after the interview with Weli,
14  can you tell me what you concluded about Weli's action
15  after his interview?
16      A.  I concluded that there was misuse of
17  company time and resources.
18      Q.  Okay.  And that was based on what exactly?
19      A.  Based on all the information gathered by
20  then.
21      Q.  Okay.  Specifically looking at --
22      A.  Everything.
23      Q.  -- her -- well, let me finish.  You were
24  looking at Weli calling -- or having the floor trainers
25  replace employees to go up to training, correct?

Page 98

1          MS. VICKLES:  Object to form.
2      A.  Looking at him being witnessed by
3  coworkers.
4      Q.  (By Mr. Okunade) Okay.  But you didn't -- I
5  mean, at the time, you didn't know what those employees
6  were going up to do, other than for translation, correct?
7          MS. VICKLES:  Object to form.
8      A.  Wasn't sure if it was for translation.
9      Q.  (By Mr. Okunade) You were just -- all you
10  were concerned about was that there were employees going
11  up to the training room?
12          MS. VICKLES:  Object to form.
13      A.  There was female employees going upstairs
14  and being in the same room with a manager.
15      Q.  (By Mr. Okunade) Okay.  If those female
16  employees had been up there for translation, would you
17  still have concluded that it was for misuse of company
18  time?
19          MS. VICKLES:  Object to form.
20      A.  Misuse of company time and resources.
21          MR. OKUNADE:  Can you repeat my question
22  for him, please.
23          (The last question was read.)
24          MS. VICKLES:  Object to form.  Asked and
25  answered.

Page 99

1      A.  You can answer again.
2      A.  Misuse of company time and resources it
3  would be.
4      Q.  (By Mr. Okunade) You would still give me
5  that conclusion?
6      A.  Yes.
7      Q.  Okay.
8          MS. VICKLES:  He just asked if we could
9  take a restroom break.
10          MR. OKUNADE:  A break?
11          THE DEPONENT:  Just restroom.
12          MR. OKUNADE:  Sure.  I mean, there's no
13  question pending, so...
14          (Recess from 12:05 p.m. to 12:14 p.m.)
15      Q.  (By Mr. Okunade) We're back on the record.
16  Before you went on break, we were looking
17  at JBS 00041.
18      A.  Okay.
19      Q.  Your notes regarding the interview that you
20  had with Weli.  So after this interview with him, did you
21  ask him then to step outside of the room, after you
22  interviewed with Weli?
23      A.  I don't recall exactly what happened right
24  after I interviewed him.
25      Q.  Okay.  Was he suspended right after your

Page 100

1  interview with him?
2      A.  He was suspended on the same day.
3      Q.  On the same day?
4      A.  Yes.
5      Q.  You don't know timewise how much time had
6  elapsed after you interviewed him?
7      A.  Honestly do not know exactly.
8      Q.  Okay.  On JBS 00049 you spoke with --
9  sorry.  This is a document of your notes regarding your
10  interview with Efrah Abdella, correct?
11      A.  Okay.
12      Q.  Is that correct?
13      A.  That's correct.
14      Q.  Okay.  And do you know whether this
15  interview with Efrah occurred prior to the interview with
16  Weli?
17      A.  I don't recall at this exact moment.
18      Q.  Okay.  Do you know what time, around, this
19  interview took place with Efrah?
20      A.  Do not recall the exact time.
21      Q.  Okay.  Who else was present during the
22  interview with Efrah other than yourself and her?
23      A.  I'm not really sure.  Maybe -- I would say
24  maybe Yulibeth Rocha may have been present.
25      Q.  Okay.  So the fact that she was present

Page 121

1    THE DEPONENT:  Clause, c-l-a-u-s-e-s.
2    MR. OKUNADE:  The clauses, okay.
3    THE REPORTER:  Of agreement, did you say?
4    THE DEPONENT:  Yes, ma'am.
5    Q.  (By Mr. Okunade) I'm not sure I understand
6  what that means, but let me move on.  I have on there
7  it's JBS 000 -- sorry -- 00224.
8    A.  Okay.
9    Q.  It's about three or four pages in.
10   A.  Okay.
11   Q.  So it has Article I, Purpose of Agreement.
12  Article 2 -- you see where I'm looking at?
13   A.  Yes.
14   Q.  Okay.  And for the sake of killing trees, I
15  didn't print the whole agreement out, but I have some
16  sections of it --
17   A.  Okay.
18   Q.  -- I'll represent to you.
19   A.  Okay.
20   Q.  The next page is Bates labeled JBS 00244.
21   A.  Okay.
22   Q.  Okay?  It talks about discipline, slash, no
23  discrimination, under Article 13.  Do you see that?
24   A.  Yes.
25   Q.  Okay.  Do you see Section 2 where it says

Page 122

1  "harassment prohibited"?
2    A.  Yes.
3    Q.  All right.  And it goes on to explain what
4  harassment is, including sexual harassment.  You see
5  that?
6    A.  Yes, I do.
7    Q.  Okay.  And then that document continues on
8  the next page, Bates Number JBS 00245.
9    A.  Mm-hmm.  Yes.
10   Q.  On the top there, it says Section 3.
11   A.  Okay.
12   Q.  Use of Grievance Procedures.
13   A.  Okay.
14   Q.  This would have been a section that would
15  have been explained to any union employee at the JBS
16  plant, correct?
17   A.  Why?
18   Q.  I'm asking you the question.  Is it a
19  section that would have been explained to the union
20  employees at the JBS plant?
21   A.  If the union does it.
22   Q.  Okay.  So as part of the training, a union
23  rep comes in and trains the employees, correct?
24   A.  What do you mean by train the employees?
25   Q.  Has a section on union representation and

Page 123

1  all that stuff.
2    A.  During orientation?
3    Q.  During new hire.
4    A.  A union member or a union rep will have to
5  come up and discuss union initiation fees and things like
6  that.
7    Q.  Okay.  And would that also include the
8  rights of a union member within the JBS Greeley plant?
9    A.  I'm not sure.  As I was not a union member,
10  I was never...
11   Q.  Okay.  Going back to the Section 3 there,
12  it says, quote, If an employee feels that they have been
13  subjected to prohibited discrimination, comma, including
14  harassment, comma, they may file grievance under the
15  grievance and arbitration provisions of this agreement.
16  You see where I'm reading?
17   A.  I do see where you're reading, yes.
18   Q.  Okay.  It continues on, it says, If the
19  employee feels they have been subject to discrimination
20  or harassment, they should immediately notify their
21  immediate supervisor, period.  If the supervisor is
22  unavailable or if the employee believes it would be
23  inappropriate to contact the supervisor, comma, the
24  employee should immediately contact the human resource
25  department, period, closed quote.  Do you see where I

Page 124

1  read?
2    A.  Yes.
3    Q.  Okay.  Did I read that correctly?
4    A.  Yes.
5    Q.  Did Anab Ali ever come -- tell you that she
6  went to her supervisor to complain about any harassment
7  that was going on?
8    A.  If Anab Ali ever came to tell me that she
9  went in to her supervisor?
10   Q.  Did Anab Ali tell you that she told any of
11  her supervisors about any alleged harassment that she
12  complained of during the interview you had with her?
13   A.  No.
14   Q.  Did Khin Ou tell you that she had
15  complained of any harassment during -- at the time that
16  you were interviewing her?
17   A.  No.
18   Q.  Okay.  All right.  Now let me circle back
19  to Exhibit 15 in your packet.  This is the one, the
20  personnel action record, again, which you put Weli on
21  suspension.  It's dated 3/11/2015.
22   A.  Okay.
23   Q.  So after you interviewed or spoke with
24  those individuals that we just talked about, did you have
25  a meeting with Yulibeth Rocha to discuss what was going

Page 129

1  Q.  Okay.  While he was out -- while Weli was
2  out of the room, do you remember what happened; what you
3  talked about, what you discussed?  Do you remember how
4  that went?
5      A.  The only thing we discuss usually in this
6  situation is the investigation and the facts present.
7      Q.  Okay.  And at the time that you were doing
8  this investigation, you only had been on as an HR
9  supervisor for less than three months, right?
10     A.  That's right.
11     Q.  Okay.  So did you talk to anybody else
12  about what you were doing?  Did you talk to anybody else
13  in HR about what you were doing, whether that was the
14  right path to take?
15     A.  Mainly Yulibeth Rocha.
16     Q.  But she wasn't HR.
17     A.  It was training.
18     Q.  She was training.
19     A.  His manager.  Weli's manager.
20     Q.  Right, right, right.  But I'm saying
21  Yulibeth Rocha wasn't HR?
22     A.  Training is part of HR.  It's one big
23  department.
24     Q.  Okay.  And Yulibeth has only been there
25  around the same time -- started as a training manager

Page 130

1  around the same time you started, correct?
2      A.  In Greeley.
3      Q.  In Greeley.  That's correct?
4      A.  Correct.
5      Q.  Okay.  So it was just both of you guys were
6  trying to figure out the route to go with Weli?
7      A.  Correct.
8      Q.  Okay.  And it's your testimony that you
9  didn't talk to anybody else in HR other than Yuli today;
10  that's your testimony today?
11     A.  What is your question?  Be specific,
12  please.
13     Q.  Your testimony today --
14     A.  Because I spoke -- I speak with lot of
15  people in HR.  So if you say you didn't speak to nobody,
16  you know, in HR, it happens as we go.
17     Q.  Okay.
18     A.  So I just want a specific question.
19     Q.  Let me give you this:  So between
20  March 10th, 2015, and March 11th, 2015, when Weli was put
21  on an indefinite suspension, is it my understanding that
22  your testimony is that the only person you spoke to in HR
23  regarding that investigation was Yulibeth Rocha?
24     A.  Yes.
25     Q.  Okay.  And do you remember who, between you

Page 131

1  and Yulibeth, made the decision to suspension Yuli --
2  Weli?  Sorry.
3      A.  It's just the process.  It would be the two
4  of us.
5      Q.  Did you look at each other and say, I think
6  suspension is warranted?  I mean, how did that come
7  about?
8      A.  We had enough findings to where Weli would
9  have to be placed on suspension.
10     Q.  And the findings are those that we --
11     A.  Are the witness statements Miguel Muniz,
12  Chandra Acharya, Marietta Lopez, Alicia Serrano, Khin Ou,
13  and so on, so forth.
14     Q.  Okay.  And I'm just want to be -- trying to
15  be specific.  And sorry for belaboring the point, but
16  again, the JBS 00040 document on Exhibit 32, that
17  document right there, was that also part of your finding,
18  summary of your finding at the time the suspension
19  occurred?
20     A.  I'm not sure if it was all written up or
21  not yet at the time.
22     Q.  Would you agree that all the information on
23  this document was found out at 3/11/2015?
24     A.  To the best of my recollection.
25     Q.  So, then, on Exhibit 15, what other

Page 132

1  investigation did you have to do concerning Weli?
2      A.  Part of investigation itself may just be to
3  further assess everything I have.
4      Q.  I'm sorry.  Say that one more time.
5      A.  Part of the investigation would be to
6  further assess everything that I had.
7      Q.  So all the information that you took, you
8  wanted time to further assess it; is that what you're
9  saying?
10     A.  In response to the initial question, it
11  was -- you said what other investigations we needed to
12  do, right?  That was the question?
13     Q.  Right.  And I'm referring to Exhibit 15
14  where it says, Weli is being placed on suspension pending
15  the results of investigation.
16     A.  Exactly.  So part of the pending results of
17  investigation is assessing everything that we had, all
18  the findings that we had by then, and just -- it's just
19  the process.
20     Q.  Okay.
21     A.  We had pretty much enough to place Weli on
22  suspension, pending making the final decision and
23  investigating further.
24         MR. OKUNADE:  Okay.  And this is a good
25  time to take a break, because we're going to talk about

Page 133

1 additional after March 11, 2015, when we come back from
2 lunch.
3     THE DEPONENT:  Very good.
4     MR. OKUNADE:  Okay.
5     (Recess from 1:02 p.m. to 1:58 p.m.)
6     Q.  (By Mr. Okunade) Okay.  Mr. Andalib, we are
7 back on the record.  Prior to the lunch break, we were
8 talking about Weli's suspension and the events that led
9 up to the suspension.  Let me ask you specifically, do
10 you remember if you considered any documents prior to
11 suspending Weli on March 11, 2015?
12     A.  Yes.  The document from the interviews and
13 the notes that I took.
14     Q.  Okay.  The notes.  Other than those, do you
15 remember any other documents that you may have looked at
16 or that you reviewed prior to your -- prior to the
17 suspension?
18     A.  Reviewed the investigation guidelines, if
19 you would, that we had at JBS.
20     Q.  Anything else?
21     A.  I'm thinking.
22     Did look at the employee handbook, just to
23 reverify and go over all the certain policies.
24     Q.  Anything else that you can remember right
25 now?

Page 134

1     A.  Not that I can remember right now.
2     Q.  Okay.  So you mentioned an employee
3 handbook.  Can you turn your attention to Exhibit 7 in
4 your exhibit list.
5     A.  Okay.
6     Q.  Is that the employee handbook that you're
7 referring to?
8     A.  Yes.
9     Q.  Okay.  And then turning on that Exhibit 7
10 to JBS 00007, on the bottom left -- or right-hand corner
11 there.
12     A.  Okay.
13     Q.  In there it talks about the process of
14 complaining about harassment, would you agree, on that
15 page?
16     A.  It gives examples of what harassment or
17 sexual harassment is, I agree.
18     Q.  Okay.  And again, Anab Ali did not tell you
19 that she reported any alleged harassment that pertained
20 to Weli, correct?
21     A.  Not that I recall.
22     Q.  Okay.  And neither did Khin Ou?
23     A.  She did not say that she reported it.
24     Q.  Okay.  And then let me have you turn to
25 Exhibit 9.  It's a JBS Code of Conduct.

Page 135

1     A.  Okay.
2     Q.  Is this a document that you would have
3 reviewed prior to the suspension?
4     A.  Yes.
5     Q.  Okay.  And again, there are JBS Bates
6 numbers on the bottom right-hand corner.  Let me have you
7 turn to JBS 000029.  See that paragraph where it starts,
8 quote, The company has established a 24, parentheses, 24,
9 closed parentheses, hour per day hotline?  Do you see
10 that?  It continues.
11     A.  Yes.
12     Q.  Okay.  Did you ask Anab Ali whether she
13 contacted that hotline number listed there?
14     A.  No, I did not.
15     Q.  Okay.  Did she tell you that she did?
16     A.  No, not that I recall.
17     Q.  Okay.  And how about Khin Ou?  Did you ask
18 her whether she had contacted the hotline number there,
19 as listed in that page?
20     A.  No.
21     Q.  You didn't ask her?
22     A.  No, not that I recall.
23     Q.  Okay.  And this is a Code of Conduct that
24 every employee at JBS would have received, correct?
25     A.  Correct.

Page 136

1     (Exhibit 38 was marked.)
2     Q.  I'm going to hand you what's marked as
3 Deposition Exhibit 38.  This is a document titled JBS
4 Workplace Investigations.  It's a policy document.  Is
5 this the document you were referring to when you just
6 testified earlier that you looked at the investigation
7 guidelines?
8     A.  Correct.
9     Q.  So -- okay.  Did you help write this
10 document, by any chance?
11     A.  No.
12     Q.  Okay.  You just are aware that the document
13 existed at the time of your interviews with the --
14 concerning the allegations of Weli?
15     A.  Correct.
16     Q.  Okay.  And do you know exactly when you
17 looked at this document during that investigation?
18     A.  I don't recall exactly when.
19     Q.  Okay.  On this Exhibit 38, the top part
20 there says "purpose."  Do you see it?
21     A.  Yes.
22     Q.  And then it goes on in that same paragraph,
23 "For more information, see the Company's Anti-Harassment
24 policy."
25     A.  Yes.

Page 137

1    Q.  Is that that same policy that was in
2  Exhibit 7 that we talked about?
3    A.  Yes.
4    Q.  Okay.  There's no other company
5  anti-harassment policy that you were aware of at the time
6  of your investigation?
7    A.  Yes.
8    Q.  Okay.  There were none, correct?
9    A.  There were some.
10    Q.  There were no other anti -- JBS's
11  anti-harassment policy that you were aware of other than
12  that company policy that we talked about in Exhibit 7?
13    A.  I'm also aware that the union, in our
14  contract with the union, there was anti-harassment policy
15  clause as well.
16    Q.  You're referring to the union document that
17  we looked at before the break?
18    A.  The contract.  So the full document that we
19  looked at, yes.
20    Q.  Okay.  Right.  So --
21    A.  Full version of it.
22    Q.  Okay.  Now, on the Exhibit 38, it goes on
23  to state "procedure."  Do you see that?
24    A.  Yes.
25    Q.  And to the best of your ability, do you

Page 138

1  think that you followed the procedure that we're
2  outlining here in your investigation?
3    A.  To the best of my abilities.
4    Q.  Okay.  The first bullet point is to make
5  sure you understand precisely what is being -- what it is
6  that is being complained of.
7    A.  Right.
8    Q.  Okay.  And under that is a bullet point
9  that says, Be sure to get specifics.
10    A.  Yes.
11    Q.  Are you saying that you got specifics on
12  the interview that you did with those employees that you
13  interviewed concerning Weli's alleged conduct?
14    A.  As specific as we could get.
15    Q.  Okay.  Do you think that putting a date as
16  to when these things happened is a specific?
17    A.  Yes.
18    Q.  Okay.  Did you make an attempt to review or
19  to determine whether there were any surveillance tapes
20  that were available during your investigation?
21    A.  Yes.
22    Q.  Okay.  And did you find out whether there
23  were any surveillance tapes?
24    A.  There were not.
25    Q.  Did you look at any surveillance tapes?

Page 139

1    A.  No.
2    Q.  Did you inquire into surveillance tapes?
3    A.  Rephrase this question, please, sir.
4    Q.  Did you inquire into whether there were
5  surveillance tapes?
6    A.  Right.
7    Q.  You did?
8    A.  I did --
9    Q.  Okay.
10    A.  -- inquire.
11    Q.  Who did you ask whether there were any
12  surveillance tapes?
13    A.  The training manager herself.  And there
14  are no cameras in the whole training area.
15    Q.  Okay.
16    A.  So the majority of the cameras are
17  mainly -- except in the main lobbies, would be located on
18  the floor, on the production floor.
19    Q.  Do you know if there's any cameras located
20  on the third floor of the JBS Greeley plant?
21    A.  I don't believe there are.  Not to my
22  knowledge.
23    Q.  On the second page of Exhibit 38 is JBS
24  00220 Bates labeled.
25    A.  Okay.

Page 140

1    Q.  And on there it says, in the second bullet
2  point, quote, In some cases, you may be able to, comma,
3  and should, comma, make credibility determinations based
4  on multiple indicators of lying, period, closed quote.
5  Did I read that correctly?
6    A.  Yes.
7    Q.  Did you make any credibility determinations
8  in this case?
9    A.  No.
10    Q.  Okay.
11    A.  Based on lying?
12    Q.  I'm just asking if you made any credibility
13  determinations.  That was the question.
14    A.  I did, if that was the question.  If I made
15  any credibility determinations?
16    Q.  Right.
17    A.  Based on my assessing the witnesses that I
18  spoke with, yes.
19    Q.  And how did you determine that Anab Ali
20  wasn't lying?
21    A.  I just didn't have any factors or any --
22  any criteria that would lead me to believe that she was
23  lying.
24    Q.  Okay.  But you made the determination that
25  she was not lying?

Page 141

1    A.  Right.
2        Q.  Okay.  Was there a reason that you didn't
3   believe Weli's story to be credible in terms of his --
4   the statement that he gave?
5    A.  Yes.
6        Q.  What was that reason?
7    A.  It was because multiple witnesses pretty
8   much said the same thing.
9        Q.  Okay.  Was there a reason that you did not
10  interview other floor trainers than the one that we've
11  talked about?
12   A.  If there is any reason, it would be that
13  they're just not -- they spend most of their time -- or
14  more time on the floor.  So didn't see that they would
15  have any -- how would I say? -- they would spend enough
16  time upstairs to be aware of what's going on, if you
17  would.
18       Q.  There was a name Daniel McGregory that
19  came up.  You didn't interview him, correct?
20   A.  Daniel McGregor?  I don't recall
21  interviewing him.
22       Q.  Okay.  Other than Weli -- well, prior to
23  Weli, had you investigated any other classroom trainers
24  since starting as HR supervisor?
25   A.  No.

Page 142

1        Q.  Okay.  Had you investigated other floor
2   trainers for anything, had you done an investigation on
3   any floor trainers prior to the investigation that you
4   conducted on Weli?
5    A.  Not that I recall.
6        Q.  Okay.  Was Weli the first employee at JBS
7   that you investigated after you started in that position
8   as HR supervisor?
9    A.  No.
10       Q.  Okay.  You had investigated other
11  employees?
12   A.  Correct.
13       Q.  Do you know what category of employees they
14  were?
15   A.  Different.
16       Q.  Okay.
17   A.  Different categories.
18       Q.  On the production floors?
19   A.  Production floor, slaughter, fab.
20       Q.  Had you investigated other employees for
21  harassment?
22   A.  Yes.
23       Q.  Okay.  Do you remember specifically which
24  employees you investigated for harassment?
25   A.  I remember one.

Page 143

1        Q.  Okay.  Which one?
2    A.  I can't remember their names exactly.
3        Q.  Do you know if it was a male or female?
4    A.  I think it was a male.
5        Q.  Okay.  And that was prior to the March
6   investigations of Weli?
7    A.  Correct.
8        Q.  Okay.  And do you know what the end result
9   of that investigation was?
10   A.  If I'm not mistaken, it was nonconclusive.
11       Q.  Okay.  And did you do that investigation by
12  yourself, or were there other people involved?
13   A.  It was by myself.
14       Q.  Do you know which category of employee that
15  was?
16   A.  I think it was a slaughter employee, but
17  I'm not sure.
18       Q.  Okay.  And had you investigated, prior to
19  Weli, other employees for violation of company policy?
20   A.  I can't recall off the top of my head, but
21  I would say probably yes.
22       Q.  Probably yes?
23   A.  But I can't recall right off the top of my
24  head.
25       Q.  So in the three months that you were there

Page 144

1   prior to the investigation of Weli, you had done an
2   investigation of another employee at JBS for violation of
3   company policy?
4    A.  I can't recall at this time exactly.
5        Q.  Okay.  And outside of Weli, have you
6   investigated -- since Weli left, have you investigated
7   any floor trainers for harassment?
8    A.  Not -- not -- I don't think so.
9        Q.  How about classroom trainers?  Have
10  you been part of or investigated any classroom trainers
11  after Weli's termination for violation of -- for
12  harassment?
13   A.  Not that I remember.
14       Q.  Okay.  Then I'm going to ask you the same
15  question, but more for the violation of company -- JBS
16  company policy.  Do you remember conducting an interview
17  into allegations made against a floor trainer at JBS,
18  after Weli left, for violation of company policy?
19       MS. VICKLES:  Object to form.  Other than
20  the harassment policy?
21       MR. OKUNADE:  Yes.  Yes.  Other than the
22  harassment policy.
23   A.  Not that I recall.
24       Q.  (By Mr. Okunade) Okay.  And the same
25  question for the classroom trainer.  Other than

Page 145

1  harassment policy within the JBS company policy, have you
2  participated in investigation alleged against a classroom
3  trainer?
4      A.  Not that I recall.
5      Q.  Okay.  Do you recall any classroom trainer,
6  other than Weli, that was put on suspension, whether or
7  not you investigated that classroom trainer, that was put
8  on suspension for harassing another employee at the JBS
9  Greeley plant?
10     A.  From January on?  January 2015 on?
11     Q.  2015.
12     A.  Please repeat that question.
13     Q.  Sure.  Since January 2015, has there been
14  any employee -- any classroom trainer that you are aware
15  of at JBS Greeley plant that was put on suspension for
16  harassment?
17     A.  For harassment.  Not that I'm aware of.  I
18  can't recall of anyone right now.
19     Q.  Okay.  And are you aware of any floor
20  trainer since January 2015 that was put on suspension for
21  harassment?
22     A.  I would say that on the B shift, I don't
23  believe so.  I'm not very aware of what happens on A
24  shift, so I can't really know what's going on on A shift.
25  But not to my recollections on B shift.

Page 146

1      Q.  Did you hear of any employee is what I'm, I
2  guess, trying to find out.
3      A.  I mean, but I don't have the details.
4      Q.  I'm not asking for details.  I just asked
5  whether you were aware that there were any either floor
6  trainer or classroom trainers that were suspended or
7  terminated for harassment?
8      A.  Not that I'm aware of.  I can't recall
9  exactly right now.
10     Q.  Okay.  Let me direct your attention to
11  Exhibit 16.  This is the personnel action record
12  documenting the termination of Weli, correct?
13     A.  Yes.
14     Q.  And again, is this your handwriting?
15     A.  Yes.
16     Q.  And on the bottom the left-hand corner
17  there, is that your signature?
18     A.  Yes.
19     Q.  Okay.  So this is dated March 13, 2015,
20  correct?
21     A.  Correct.
22     Q.  From the time Weli was suspended on
23  March 11, 2015, through March 13, 2015, tell me what you
24  did in terms of additional investigation that led you to
25  the conclusion here in this personnel action report.

Page 147

1      A.  Put everything together, all the facts that
2  I had together.
3      Q.  You put all the facts together?
4      A.  As far as I remember.
5      Q.  Okay.  Did you talk to any additional
6  employees other than the ones that we've already spoken
7  of?
8      A.  Not that I recall at the moment.
9      Q.  Okay.  Other than the employees that you
10  interviewed, did you talk to Ms. Yulibeth Rocha?  And I'm
11  talking about the time frame between March 11 and
12  March 13.
13     A.  I'm sure I have.
14     Q.  You're sure you have?  Did you talk to Max
15  during this time frame?
16     A.  Could you be specific with your question,
17  please, sir?  I mean, yes, I did talk to Max.
18     Q.  Okay.
19     A.  I said, Good morning.  How are you?  I
20  mean, is that what you mean by just speaking with him?
21  Or regarding the case?
22     Q.  It was a general question, so, I mean,
23  that's fine.
24     A.  I'm sure I've said hi.
25     Q.  Okay.  So then the more specific question

Page 148

1  is:  Did you talk to him about the case, the
2  investigation into Weli, during the -- March 11 and
3  March 13?
4      A.  The person that I spoke to regarding the
5  case of Weli would mainly be Yulibeth Rocha.
6          MR. OKUNADE:  That's not my question,
7  though.  Can you repeat that question, please.
8          (The last question was read.)
9      A.  How -- I'm trying to recollect.  I mean,
10  the suspension -- the investigation was my responsibility
11  along with Yulibeth Rocha.  Barely spoke to Max about it
12  at all.
13     Q.  (By Mr. Okunade) Okay.  But you did speak to
14  him?
15     A.  I'm sure, yes.  Speak with him every day,
16  as my boss.
17     Q.  Okay.  Did you talk to him before writing
18  this Exhibit 16?
19     A.  Not that I recall.
20     Q.  Did he express any opinion about you
21  writing this Exhibit 16?
22     A.  No, not that I recall.
23     Q.  Okay.  Let's go back to Exhibit 32.  Okay.
24  JBS 00053.
25     A.  Okay.

Page 149

1    Q.  And this is a handwritten document.  It has
2  Abdelilah.  Is that the same Abdelilah Karim that we've
3  been talking about?
4    A.  Correct.
5    Q.  Okay.  Did you interview Abdelilah Karim
6  prior to March 13, 2015?
7    A.  I may have spoken with him on the phone.
8    Q.  Okay.  Do you remember how that
9  conversation went?
10    A.  Pretty much I needed a confirmation about
11  what one of the witnesses had said, and he happened to be
12  the supervisor.  And that was what the conversation was
13  about.
14    Q.  Okay.  And I think you've said that before
15  too.  But now more specifically after looking at this
16  document, do you remember what confirmation on what
17  information you were looking for?
18    A.  About confirming that Efrah would --
19  would rather not go upstairs at times when asked by Weli.
20    Q.  But would you agree with me that this note
21  indicates that Efrah went up to training department to
22  help Weli translate?
23    A.  It says that on several occasions she did
24  assist him to translate and train in office.
25    Q.  I'm sorry?

Page 150

1    A.  The statement does say that Efrah did
2  assist in several occasions to translate in the training
3  office.
4    Q.  Okay.  But the statement doesn't say
5  anything about Efrah going up -- or Weli calling Efrah up
6  for personal reasons, correct?
7    A.  No, it does not.
8    Q.  Okay.  Did you take this document into
9  consideration in making your termination decision?
10    A.  All the documents prior to this were
11  sufficient for a decision.
12    Q.  Okay.  So all the documents prior to this
13  were dated March 11, 2015?
14    A.  Correct.
15    Q.  But --
16      MS. VICKLES:  Object to form.
17    Q.  (By Mr. Okunade) But you stated -- your
18  testimony was that instead of terminating Weli prior to
19  March 13th, you decided to put him on suspension,
20  correct?
21    A.  That's the process.  Yes.
22    Q.  So as of March 13th, you had no additional
23  information from what you had on March 11, 2015?
24    A.  Not information, but more time to discuss
25  it.

Page 151

1    Q.  Okay.  And you discussed it with only Yuli
2  is your testimony?
3    A.  His manager.
4    Q.  Weli's manager.  Now, Yulibeth sat in on
5  some of the interviews that you did on March 11, correct?
6    A.  I believe so.
7    Q.  Specifically on Efrah's interview, as you
8  testified?
9    A.  Correct.
10    Q.  Did she sit in on Anab Ali's interview?
11    A.  I don't recall if she did or not.
12    Q.  But she sat in on Weli's interview on the
13  11th, correct?
14    A.  I believe so.
15    Q.  Okay.  So you had time to talk to Yuli on
16  March 11 on all the information that came in on March 11?
17    A.  Not necessarily on March 11.  It may have
18  been the 12th.
19    Q.  Sure.  But I'm just asking did you talk to
20  Yuli on March 11 regarding the information that you
21  gathered on March 11?
22    A.  I don't exactly recall whether we spoke
23  about all the information that came up again.
24    Q.  But there was no additional information,
25  other than this March 13 dated document from Abdellah,

Page 152

1  that came in after March 11th?
2    A.  I believe so.
3    Q.  And all that is left to do was just to talk
4  to Yuli about decisions; that's your testimony?
5    A.  Pretty much.
6    Q.  Okay.  And on the 13th, as on Exhibit 16,
7  you terminated Weli.  Did you call him to terminate him,
8  or did somebody else call him?
9    A.  I did.
10    Q.  Okay.  And did you ask him to provide any
11  statement at that time regarding any of the statements
12  that you took on March 10th, March 11th, or the statement
13  from Abdelilah Karim that we just looked at on
14  March 13th, did you ask Weli to provide any additional
15  information relating to the information that you
16  received?
17    A.  I can't recall exactly.
18    Q.  Okay.  If you had, would you be able to
19  recall that?
20    A.  I honestly can't recall at this moment.  I
21  really can't.
22    Q.  Okay.  Did you ask him to provide any
23  statements on March 13, 2015?
24    A.  I don't recall at this time whether I asked
25  or not.

Page 153

1    Q.  Okay.  But his statement would have been --
2  if he had provided one, it would have been part of the
3  investigation document, correct?
4    A.  Correct.
5    Q.  And just to wrap up on Exhibit 32 here,
6  there's a couple more documents.  JBS 00042.  I'm on
7  Exhibit 32.  On the bottom there is the name Marietta
8  Herrera Lopez.  You see that?
9    A.  Yes.
10    Q.  Dated March 26, 2015?
11    A.  Yes.
12    Q.  Okay.  Was there a reason why this document
13  was provided to me by your attorney relating to the
14  investigation of Weli?
15    MS. VICKLES:  Object to form.
16    Q. (By Mr. Okunade) Weli's termination?
17    MS. VICKLES:  Object to form.
18    A.  I'm not sure.
19    Q. (By Mr. Okunade) Why do you think that
20  document would have been dated March 26th, 2015?
21    A.  I think -- and that's if I remember right,
22  I think that with this one here, I had lost a copy, this
23  copy, a copy of the notes, I believe, and I asked if she
24  could rewrite it.  If I remember right.
25    Q.  Okay.  So you lost a copy of the note that

Page 154

1  she originally provided?
2    A.  Right.
3    Q.  Okay.  Now, I don't want you to -- is that
4  your understanding of why this is dated March 26th?
5    A.  (Nodded head.)
6    Q.  Is that a yes?
7    A.  I believe so, yeah.
8    Q.  Okay.  And so this would have been a
9  replication, to the best of Marietta's ability, of what
10  she told you during -- at the time she originally wrote
11  the note?
12    A.  I believe so, yeah.  And I had -- well, I
13  had found it, but then right after, so...
14    Q.  You found everything --
15    A.  Everything meaning the notes that I had.
16    Q.  Okay.  So you find a note that was dated
17  prior to March 26th, 2015, from Marietta Lopez?
18    A.  Right.
19    Q.  You did?
20    A.  Yes.
21    Q.  Okay.  Was there a reason that is not
22  provided to me?
23    A.  This is it right here.  This is the note
24  that I had.
25    Q.  But that's the one --

Page 155

1    A.  0043.
2    Q.  43.  That's the one you handwrote, correct?
3    A.  Right.
4    Q.  So you lost -- you misplaced both your
5  handwritten notes and the employee note from Marietta
6  Lopez?
7    MS. VICKLES:  Object to form.
8    A.  No.  Just -- just my notes, I believe.
9    Q. (By Mr. Okunade) Okay.  So you just
10  misplaced your notes?
11    A.  Correct.
12    Q.  And then you asked Marietta to write a note
13  for you after you lost your note?
14    A.  Right.
15    Q.  Okay.  You didn't ask Marietta to write a
16  note on March 10th when you interviewed her?
17    A.  I did.  I asked -- part of the process is
18  that I ask everybody to write a note.  A lot of times
19  it's very hard to get an employee to write a statement.
20    Q.  Okay.  But I don't see a note from Weli.
21    A.  A statement.
22    Q.  I don't see a statement from Weli.  Do you
23  agree with that?
24    A.  I don't see one.
25    Q.  I don't see a statement from Marietta Lopez

Page 156

1  that's dated prior to March 26th, 2015.  Would you agree
2  with that?
3    A.  A handwritten statement, no I don't see
4  one.  I agree.
5    Q.  Okay.  So I'm just trying to understand.
6  If you ask an employee to write a handwritten note on an
7  investigation that's ongoing, is there a reason why this
8  is dated March 26th, 2015?  That's my question to you.
9    MS. VICKLES:  Objection, asked and
10  answered.
11    Q. (By Mr. Okunade) While you think about that,
12  did you ask her to write a note on March 26th, 2015?
13    A.  I believe so, yeah.
14    Q.  Okay.  And was there still -- were you
15  still investigating Weli on March 26th, 2015?
16    A.  No.
17    Q.  Okay.  And the only reason you asked her to
18  write a note was because you had misplaced your original
19  note during the investigation into Weli's alleged
20  actions?
21    A.  Correct.
22    Q.  Okay.  All right.  I think I understand.
23    On the note that Marietta Lopez wrote that
24  we're looking at, in the first paragraph it says -- where
25  it says, quote, Because Weli had gone to A shift.  Do you

Weli A. Farah vs.                                                    Deposition of Kacem Andalib
JBS USA, LLC                                                                    August 01, 2016

Page 185

1      Q.  Yeah.  You talked to Max during the
2  investigation into Weli?
3      A.  Okay.
4      Q.  Yes or no?
5      A.  Yes.
6      Q.  Okay.  Do you know how you spoke to him,
7  whether phone, email, walking back and forth?
8      A.  Most of the time, it would be a personal
9  conversation or discussion.
10     Q.  Okay.  You don't remember sending him an
11 email about the investigation into Weli?
12     A.  No.
13     Q.  Do you recall whether he sent you an email
14 about that?
15     A.  No.
16     Q.  Okay.  And what about phone calls?
17     A.  No.
18     Q.  You don't recall?
19     A.  No.
20     Q.  Is it that you don't recall, or he did not?
21     A.  He did not.  And I don't recall having any
22 phone conversations regarding Weli's investigation with
23 anyone.
24     Q.  Okay.  In general, in your conversations
25 with Mr. Max, I mean, would you guys talk about -- or do

Page 186

1  you remember if you talked about any employees at the JBS
2  Greeley plant?  Would you discuss employees?
3      A.  No.  Mainly turnover and absenteeism.
4      Q.  When you say turnover, are you talking
5  about people leaving the plant?
6      A.  Correct.
7      Q.  In what context would that be?  Is it in
8  terms of a report that you have to turn in to him, or
9  just in general discussion?
10     A.  General discussion.  How is it looking on B
11 shift?  How's the turnover?  How's the attendance?
12     Q.  Do you know what the general perception of
13 Mr. Max was at the JBS Greeley plant from -- did you hear
14 anything about him from the employees?
15     A.  Not really, no.
16     Q.  Okay.  In your dealings with him
17 personally, how did you find him?
18     A.  Normal.  I mean, cool, I guess.  I mean,
19 normal.
20     Q.  Did you get to find out how old he was?
21     A.  I think he was, like, 25 or 26.  I'm not
22 sure.
23     Q.  Did Mr. Xasan say anything to you about any
24 of the other Somalians working at JBS plant?
25     A.  No, not that I can recall.

Page 187

1      Q.  Have you heard of the term "community
2  leaders" around the JBS plant?
3      A.  Sure, I did.  A little bit.
4      Q.  Okay.  What did you hear about it?
5      A.  I heard that they are the religious
6  leaders, is pretty much what I heard.
7      Q.  Religious leaders?
8      A.  Yeah, the religious leaders.  There are
9  just a couple of folks that I personally know.
10     Q.  Who are those?
11     A.  Mohammed and Mohammed.
12     Q.  Are those two people, or one person?
13     A.  No, two.
14     Q.  And they were both named Mohammed?
15     A.  Mohammed, yes.
16     Q.  Did they have a last name or --
17        MS. VICKLES:  Could also be Mohammed.
18        THE DEPONENT:  Yeah.
19        MS. VICKLES:  Sorry.  Believe it or not,
20 there are quite a few employees named Mohammed.
21        MR. OKUNADE:  I'm coming to realize that.
22     Q.  (By Mr. Okunade) So you don't know the last
23 names of any of -- either of them?
24     A.  I can get the last names maybe later.
25     Q.  That's okay.  I'm just asking you now as

Page 188

1  you sit --
2      A.  I can't recall the last names right now.
3      Q.  Sorry.  I don't mean to talk over you.  Do
4  you know where Mohammed Number 1 was from?
5      A.  Somalia.
6      Q.  Okay.  Do you know which part of Somalia?
7      A.  No, I do not.
8      Q.  Do you know where Mohammed Number 2 was
9  from?
10     A.  Somalia.
11     Q.  Do you know which part?
12     A.  No, I do not.
13     Q.  Okay.  And you said you were familiar with
14 those two?
15     A.  Yeah.  Yeah.  I would say that I am a
16 little bit.
17     Q.  How so?
18     A.  Because during Ramadan, I contacted them
19 and informed them that we're going to make sure that the
20 prayer break or the break fast time would coincide with
21 the break, and if they had any issues or if the community
22 had any issues with not being able to go eat or pray at
23 the right time, they can come see me and I will, you
24 know, ensure that they get their accommodations, pretty
25 much in this --

Weli A. Farah vs.                                                    Deposition of Kacem Andalib
JBS USA, LLC                                                         August 01, 2016

Page 197

1  harassment policy?
2      A.  Yes.  It's part of the process that I
3  follow with everyone.
4      Q.  Did you remind them that if they ever felt
5  that they were being harassed, they should report it
6  right away?
7      A.  Yes.
8      Q.  Would the fact that an employee who felt
9  they had been harassed but they hadn't reported it to
10 anyone, would that relieve the company of its obligation
11 to take action in response to the harassment?
12     MR. OKUNADE:  Object to form.
13     A.  It's still harassment.  We still have to do
14 the right thing.
15     Q.  (By Ms. Vickles) Whether the employee
16 complained or not?
17     A.  Correct.
18     Q.  Remind me.  You were hired at the Greeley
19 plant in October 2014?
20     A.  Correct.
21     Q.  Did you ever work with Bereket Gerezgihar?
22     A.  No.
23     Q.  Was he gone before you started?
24     A.  Yes.
25     Q.  Do you know when Mr. Gerezgihar left his

Page 198

1  employment are JBS?
2      A.  Summer 2014.
3      Q.  Would Mr. Gerezgihar ever have had an
4  opportunity to observe you at work at the Greeley plant?
5      MR. OKUNADE:  Object to form.
6      A.  I never saw him.  He does not -- I do not
7  know what he looks like.
8      Q.  (By Ms. Vickles) Do you recall when Yulibeth
9  Rocha started working at the Greeley plant?
10     A.  About a week or two after I went to HR.  So
11 January 2015, sometime there.
12     Q.  And do you have knowledge of how she may
13 have changed who was or was not a team lead in the
14 training department?
15     A.  No, not that I recall.
16     Q.  Can you describe what -- you testified
17 earlier that it was your understanding that Weli Farah
18 was a team lead on B shift.  What was your understanding
19 based on?
20     A.  Based on -- based on talking to the other
21 witnesses.  They -- my understanding was pretty much that
22 he was the lead from --
23     THE REPORTER:  Lead from what?
24     MS. VICKLES:  He said from them referring
25 to him that way.

Page 199

1      A.  Yes.
2      Q.  (By Ms. Vickles) So other trainers had
3  reported to you that they considered Mr. Farah their
4  lead?
5      A.  Yes.
6      Q.  I wanted to ask you some questions about
7  Exhibit 28, which is Weli Farah's Kronos records.
8      A.  Okay.
9      Q.  And is it correct that these Kronos records
10 are from December 31st, 2012, through March 18th of 2016?
11     A.  That's correct.
12     Q.  If you look through all of that time
13 period, was Mr. Farah working primarily the B shift?
14     A.  Yes.
15     Q.  Did you note a period beginning
16 mid-February 2015 when he started working some split
17 shifts?
18     MR. OKUNADE:  Object to form.
19     A.  I can see that.
20     Q.  (By Ms. Vickles) Do you see any days when he
21 was working strictly day shift?
22     MR. OKUNADE:  Object to form.
23     A.  No, I do not.
24     Q.  (By Ms. Vickles) What time does A shift
25 start in the morning?

Page 200

1      A.  6:00 a.m.
2      Q.  So on those days when Mr. Farah was working
3  split shifts, do you see what time he was arriving at the
4  plant?
5      A.  Looks to me like he would arrive from seven
6  o'clock, eight o'clock, nine o'clock, even ten o'clock at
7  times.  6:49.  It says ten o'clock on this one.  Nine
8  o'clock.  9:14.  6:55.  8:55.  8:58.  7:45.  7:39.  8:37.
9  So definitely after A shift has already started.
10     Q.  And on those days, does it appear he was
11 working a split shift?
12     A.  That's what it looks like to me.
13     Q.  And on March 11th of 2015, I believe you
14 testified earlier that the Kronos shows he punched out at
15 1500 or three o'clock?
16     A.  He has a punch at three o'clock.  But from
17 looking over here, again, the punch was not effectuated,
18 was not done by -- by the person.  Somebody had to punch
19 him in or out.  And that would have to be a supervisor or
20 Kronos clerk by instruction from the supervisor.
21     Q.  And how can you tell that?
22     A.  Because it says here, Forgot to punch in or
23 out.
24     Q.  Does that note mean that Mr. Farah himself
25 did not punch out that day?